**Richard MORALES**

v.

**GREAT AMERICAN CORPORATION, J. Clifford Ourso, Sr., and Max Pace.**

**Civ. A. No. 75–179.**

United States District Court, M. D. Louisiana.

Feb. 10, 1978.

---

David Lopez, New York City, James C. Lopez, Glusman, Moore, Lopez & Wilkinson, Baton Rouge, La., for plaintiff.

Campbell C. Hutchinson, Stone, Pigman, Walther, Wittmann & Hutchinson, New Orleans, La., for Great American Corp.

James S. Holliday, Jr., McCollister, Belcher, McCleary, Fazio, Mixon, Holliday & Jones, Baton Rouge, La., Anthony J. Correro, III, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., for J. Clifford Ourso and Max Pace.

E. GORDON WEST, District Judge:

This action is purportedly brought by the plaintiff, Richard Morales, a shareholder of the defendant, Great American Corporation (GAC), on behalf of GAC and for the benefit of its stockholders, to compel the individual defendants, J. Clifford Ourso, Sr. and Max Pace, to account for profits allegedly realized by them from the purchase and sale of stock in contravention of Section 16(b) of the Securities Exchange · Act of 1934, as amended, 15 U.S.C. § 78p(b), hereinafter sometimes referred to simply as "the Act," or as "Section 16(b)."

As stated in brief by counsel for plaintiff: "The facts upon which this action will be decided are not subject to genuine dispute. The bulk of them have been established through interrogatory and documentary discovery responses of the individual defendants and through a stipulation among counsel to the various parties in lieu of the taking of the depositions of · the individual defendants. The remainder are matters of public record. Plaintiff believes the only differences among the parties to be ones of interpretation of law and he seeks to have the Honorable Court resolve those differences. This motion is therefore brought by plaintiff pursuant to rule 56 of the Federal Rules of Civil Procedure, seeking summary judgment."

Defendants responded by moving for summary judgment in their favor, and it is these cross motions for summary judgment that are presently before the Court.

Based upon the following findings of fact and conclusions of law, the Court concludes that plaintiff's motion should be denied, and defendants' motion for summary judgment should be granted, dismissing this suit.

The defendant, Great American Corporation, is a Louisiana corporation whose common stock, at all times relevant hereto, has been registered under Section 12(g) of the Securities Exchange Act of 1934. The defendants, J. Clifford Ourso, Sr. and Max

Pace, were, and are, President and Executive Vice-President, respectively, of GAC, and both were and are members of the Board of Directors of that corporation. On October 2, 1973, Mr. Ourso purchased 5,000 shares of the common stock of GAC, which had a par value of $2.50 per share, for $16.00 per share, and on October 15, 1973, he acquired an additional 5,000 shares, for which he paid the equivalent of $16.125 per share. This latter acquisition was paid for by exchanging shares of United Companies Financial Corporation, which shares had an equivalent value. On the same day, and in the same manner, Mr. Pace acquired 2,000 shares of GAC. Approximately three months later, on January 15, 1974, Mr. Ourso, Mr. Pace, and others not involved in this suit, sold an aggregate of 475,269 shares of the common stock of GAC for $30.00 per share. The 10,000 shares acquired by Mr. Ourso in October of 1973, and the 2,000 shares acquired by Mr. Pace in the same month were included in this sale. Mr. Ourso sold a total of 130,800 shares, and Mr. Pace sold a total of 12,000 shares and were given approximately 29 per cent of the purchase price in cash, with the remainder being represented by promissory notes payable in eight annual installments and bearing interest at 6 per cent per annum. Since this sale was consummated within six months from the date of acquisition of some of the stock by Mr. Ourso and Mr. Pace, it appeared to them that they might be obligated, under Section 16(b), to account for their short-swing profits to GAC. They thus initiated discussions about it with the Board of Directors, and these discussions led to a full and complete accounting by Ourso and Pace to GAC of all profits realized by them as a result of the sale on January 15, 1974 of the 12,000 shares acquired by them in October of 1973. In May of 1974 Mr. Ourso gave GAC $42,502.13 in cash and a promissory note for $98,856.25 payable in eight annual installments and bearing 6 per cent per annum interest. Mr. Pace, at the same time, gave GAC $8,463.45 and a promissory note for $19,702.50, payable in eight annual installments and bearing interest at 6 per cent per annum. The ratio of cash and notes was exactly the same as that received by Ourso and Pace from their purchasers, and the rate of interest and terms of payment of the notes were exactly the same. These payments to GAC also included interest accrued on the cash portion at 6 per cent, and it included dividends paid to Ourso and Pace on the 12,000 shares in January of 1974. Thus, in May of 1974, a complete and total accounting was voluntarily made by Mr. Ourso and Mr. Pace of all short-swing profits attributable to the sale of the stock purchased by them in October of 1973, and sold by them in January of 1974.

During the latter part of 1974, relations between the buyers and sellers of the stock became strained, and there was an indication that at least some of the buyers might have difficulty paying installments as they came due on the notes given as part of the purchase price. The January, 1974 sale also became a subject matter of litigation, and the defendants felt that this might result in adverse publicity for GAC. Because of these developments, an Agreement For Rescission of the January 15, 1974 sale of GAC stock was entered into on December 30, 1974 between all of the buyers and all but one of the sellers, including Mr. Ourso and Mr. Pace. As a result of this agreement, the January 15, 1974 sale was completely rescinded as though it had never been made. As between the parties to the agreement, all shares of stock sold were returned to the respective sellers, together with cash representing all dividends received by the buyers, and in return, the sellers delivered to the buyers their promissory notes, the cash payment received from the buyers, together with interest at 6 per cent per annum, on the cash down payments for the period during which the sellers had the use of that money. Thus, both buyers and sellers who were parties to this agreement for rescission were placed, with respect to each other, in exactly the same position that they were immediately before the sale of January 15, 1974. No profit of any kind had inured to anyone. But in May of 1974, Mr. Ourso and Mr. Pace had paid over to GAC,

in cash and promissory notes, what they thought were profits realized or to be realized by the January 15, 1974 sale. Thus, after the rescission, GAC was in possession of cash and notes of Mr. Ourso and Mr. Pace, representing profits which, because of the rescission, had failed to materialize. Mr. Qurso and Mr. Pace had sustained losses in the amount of that cash and these notes. In order that GAC be not unjustly enriched, and in order that Mr. Ourso and Mr. Pace be not required to suffer such a loss, GAC refunded to them the cash which they had turned over to GAC, and returned to them the promissory notes which they had given to GAC. It is noted that neither Mr. Ourso nor Mr. Pace received any interest on the money representing a part of the anticipated profits which had been held by GAC for approximately a year. Thus it would appear that while all other parties were "made whole" by the rescission and the return of the anticipated profits to Ourso and Pace, the latter two actually suffered a loss because no interest was paid them on the cash which had been held for about a year by GAC. In any event, it is abundantly clear that neither Mr. Ourso nor Mr. Pace realized any profit from this series of transactions. And it is also abundantly clear that the Agreement For Rescission entered into nearly twelve months after the January 15, 1974 sale, and some seven months after an accounting of anticipated profits had been made by Ourso and Pace to GAC, was not entered into by these defendants for the purpose of avoiding liability under Section 16(b). Indeed, in view of the complete accounting to GAC made in May of 1974, and in view of the fact that neither Mr. Ourso nor Mr. Pace realized any profit from these transactions, it is extremely doubtful that they had even an exposure under Section 16(b). Because of the voluntary action of Mr. Ourso and Mr. Pace in accounting to GAC in May of 1974, the only one who could have realized any profit from these transactions was GAC, and that is exactly what Section 16(b) required.

Approximately two months after the Agreement For Rescission was entered into and consummated, the plaintiff, Richard Morales, filed this suit. According to the testimony contained in his deposition, this is one of somewhere between 50 and 150 such suits that he has filed or participated in after purchasing a token number of shares in various corporations. He also stated that he had made "quite a few" other such demands that did not result in law suits. Plaintiff's attorney, on the other hand, says in his brief that the "much quoted reference to 150 actions is factually wrong," and that the plaintiff has actually "been plaintiff in between five and seven actions in each of those three years." Thus, apparently, plaintiff's counsel admits that the plaintiff has been "plaintiff" in possibly 21 suits in three years. He apparently does not admit or deny plaintiff's statement to the effect that the plaintiff has been involved, one way or another, in possibly as many as 150 such suits. In this particular instance, on February 27, 1975, the plaintiff bought ten shares of stock of the defendant GAC for $137.70, and on March 3, 1975, four days later, filed this suit. While it is not necessary to draw any inferences in order to arrive at a decision in this case, and while no such inferences were used in this Court's determination of the merits of this case, the inferences that could be drawn are interesting indeed. To say the least, it appears that neither the plaintiff nor his counsel did their homework in this instance. Plaintiff states, in his deposition, that his only motivation in purchasing this stock was the fact that while sitting in "his broker's waiting room" he was intrigued when he saw, perchance, the latest financial statement of GAC which, he said, showed a nice increase in earnings. This, he said, prompted him to buy ten shares of stock. As a matter of fact, the two latest financial statements of GAC that were or that could possibly have been available to stockholders at that time, showed a sizeable decrease in earnings each year. The most recent report that would have been available to stockholders in February of 1975 was the 1973 Annual Report which showed a decrease in earnings of 1.6 million dollars, or $1.00 per share. If by chance the plaintiff had seen the statement

showing earnings for 1974, it would have reflected that earnings for that year decreased by more than $200,000. While no inferences need be drawn from these apparent misstatements of fact by the plaintiff, nevertheless they do tend to affect the credibility and good faith of the plaintiff, and indeed his counsel, in bringing this suit. It is inconceivable that this suit could have been prepared and filed in the short time between the plaintiff's actual purchase of the ten shares of GAC stock, and the date of filing if, as plaintiff and his counsel contend, neither of them had any knowledge of this corporation and the transactions here involved prior to plaintiff's purchase of that stock. Even though it is immaterial to a resolution of this case, this Court simply does not believe that story. This Court believes that the ten shares of stock were purchased by the plaintiff on or about February 27, 1975, for the sole purpose of bringing this suit.

The plaintiff contends that neither his good nor bad faith nor the date upon which he acquired the ten shares of stock could have any bearing whatsoever upon his standing to bring this suit. Defendants, on the other hand, contend that the prohibitions contained in Rule 23.1 of the Federal Rules of Civil Procedure should be dispositive of this question and they cite *Bateson v. Magna Oil Corp.*, 414 F.2d 128 (CA 5—1969), in support of that contention. Defendants read *Bateson* as authority for the proposition that a plaintiff who holds after acquired stock should be estopped, on equitable grounds, from suing the corporation for acts which occurred prior to his acquisition of stock, and that this principle applies whether the suit is brought pursuant to Rule 23.1 of the Federal Rules of Civil Procedure, or under Section 16(b) of the Securities Exchange Act, especially in cases where the plaintiff had knowledge of the alleged wrongdoings before he bought his stock. While inferences may certainly be drawn in this case which would lead to the conclusion that the plaintiff had prior knowledge of the transactions forming the basis of this suit, the fact remains that the plaintiff denies this and there is no direct evidence in the record to refute his contention. But be that as it may, even in *Bateson*, the Court pointed out in a footnote that cases brought under Section 16(b) were not governed by Rule 23.1 and it cited *Blau v. Mission Corp.*, 212 F.2d 77 (CA 2—1954) in support of that proposition. *Blau* was quite direct on this point, stating that:

"The complaint is not defective for failure to allege that plaintiff was a shareholder at the time of the transaction complained of in accordance with Federal Rules of Civil Procedure, Rule 23(b), and Delaware General Corporation Law, 8 Del.C. § 327; those provisions directed particularly to the shareholders derivative actions to recover for misdeeds of corporate officials, cannot, even if so perhaps intended, override the direct mandate of § 16(b) that suits may be brought 'by the owner of any security' without qualification." (Citations omitted.) 212 F.2d at 79.

See also *Benisch v. Cameron*, 81 F.Supp. 882 (S.D.N.Y.—1948), and *Dottenheim v. Murchison*, 227 F.2d 737 (CA 5—1956). And in *Magida v. Continental Can Co.*, 231 F.2d 843 (CA 2—1956), the Court, in reaffirming this position, said:

"Since the policy of the statute is to protect minority stockholders and the public against manipulated market fluctuations, certainly this stockholder, who became such after the acts in question had taken place, cannot be estopped by corporate acts, even those having the apparent approval of a majority of stockholders. The action under § 16(b) is derivative in the sense that the corporation is the instrument, sometimes unwilling, for the effectuation of the statutory policy; but this so-called derivative nature of the right, when coupled with the doctrine of estoppel, cannot serve to defeat the very policy it was created to advance."

Thus, while it would be easy to conclude that the equities involved require a holding that a "bad faith" plaintiff should not be entitled to maintain such an action, the current and prevailing law requires an opposite conclusion. Therefore, this Court re-

luctantly concludes that the plaintiff does, under the prevailing jurisprudence, have standing to maintain this action. However, this Court also concludes that under the better view of the prevailing jurisprudence, the plaintiff cannot prevail on the merits.

Defendants rely primarily on *Hennesey v. Fein*, 184 F.Supp. 86 (S.D.N.Y.—1958); *Kahansky v. Emerson Radio and Phonograph Corp.*, 184 F.Supp. 90 (S.D.N.Y.—1960), and *S & S Realty Corp. v. Kleer-Vu Industries, Inc.*, CCH Fed.Sec.L.Rep. ¶ 96,056 (S.D.N.Y. —1977), while the plaintiff relies heavily on *Volk v. Zlotoff* 285 F.Supp. 650 (S.D.N.Y.— 1968) and *Lewis v. Manson*, CCH Fed.Sec.L. Rep. ¶ 90,915. Suffice it to say that both *Volk* and *Lewis* are easily distinguishable on their facts from their present case. In *Lewis*, there was no actual rescission as there was in the present case. The sale in *Lewis* was "rescindable" for a period of two years, and while the defendant had *agreed* to repay profits realized to the corporation, no such repayment was a part of the facts. In *Volk* of considerable concern to the court was the fact that:

> "This rescission was not in the least detrimental to the defendants; they were reinvested by the rescission with the very same stock options, which they could exercise in the future, and they retained the profits from the sales. If anything, the practical outcome of the rescission was to benefit the insiders substantially through their very violation of the statute." 285 F.Supp. 650 at 657.

This is not even close to being analogous to the situation in the present case. Here, after the initial purchase and sale, the defendants, Ourso and Pace, made a full accounting of profits to the corporation. Then, at a later date, for reasons wholly unrelated to Section 16(b), they effected a complete and total rescission, ab initio, of the sale. As the stipulation filed in lieu of defendants' depositions shows, "the rescission was in no part motivated by a desire by Messrs. Ourso and Pace to avoid liability under Sec. 16(b)." And, as is conclusively shown by the other stipulated facts in this case, as a result of the accounting by Ourso and Pace to the corporation in May of 1974,

the rescission of December 30, 1974 and the repayment by the corporation, after the rescission, to Ourso and Pace, of the anticipated profits, which, because of the rescission, did not finally materialize, neither Mr. Ourso nor Mr. Pace realized any profit or gain from the transactions. Since the rescission was in no way an attempt to frustrate the purpose of Section 16(b), and since no profit or gain inured to the benefit of either Mr. Ourso or Mr. Pace, we conclude that the *Hennesey, Kahansky*, and *S & S Realty Corp.* cases, supra, are dispositive of this case. In *S & S Realty Corp.*, the Court said:

> "It is obvious that in order to sustain a cause of action predicated upon Section 16(b), it must appear that Osher purchased and sold the stock of Kleer-Vu within a six month period and realized a profit on the transaction. It is beyond dispute that the end result of the 'purchase and sale' in this instance was a return to the status quo. Osher stands no richer today after the rescission than he did before the purchase. There are no profits to disgorge. See *Kahansky v. Emerson Radio & Phonograph Corporation*, 184 F.Supp. 90 (S.D.N.Y.1960), *Hennesey v. Fein*, 184 F.Supp. 86 (S.D.N.Y. 1958)."

The Court continued:

> "*Volk v. Zlotoff*, 285 F.Supp. 650 (S.D.N. Y.1968) is not analogous to the situation here. In *Volk*, defendants consummated purchases and sales, and without affecting their retained profits, the corporation attempted to protect them from insider liability by rescinding the exercise of stock options. In *Volk*, defendants clearly emerged with a profit."

The same may be said as to the "return to the status quo" in the present case, and the distinction between the present case and *Volk* is as valid as it was in the *S & S Realty Corp.* case. Thus, for these reasons, plaintiff's motion for summary judgment will be denied, and defendants' motion for summary judgment will be granted, dismissing this suit at plaintiff's cost. Judgment will be entered accordingly.