Seymour A. OLIFF, Plaintiff,

v.

EXCHANGE INTERNATIONAL CORPORATION, the Issuer, a Delaware Corporation, and Edward L. Sax, Samuel Wm. Sax and the Continental Illinois National Bank and Trust Company of Chicago, as Co-Trustees of the Marital and Residuary Trusts under the Last Will of George D. Sax, Defendants.

No. 76 C 4712.

United States District Court, N. D. Illinois, E. D.

April 10, 1978.

Supplemental Order May 22, 1978.

---

Jerrold M. Shapiro, Chicago, Ill., for plaintiff.

Donald E. Egan, Lee Ann Watson, Katten, Muchin, Gitles, Zavis, Pearl & Galler, Chicago, Ill., for defendant Exchange Intern. Corp.

William T. Kirby, Roger J. McFadden, Michael B. Roche, Hubachek, Kelly, Rauch & Kirby, Chicago, Ill., for defendant Rhoda Sax.

Walter Roth, Selwyn Zun, Robert W. Gettleman, Wilson P. Funkhouser, D'Ancona, Pflaum, Wyatt & Riskind, Chicago, Ill., for defendants Samuel Wm. Sax and Exchange Intern. Bank of Chicago.

Richard J. Prendergast, Kevin M. Forde, Chicago, Ill., for defendants Edward L. Sax and Continental Ill. Nat. Bank & Trust Co. of Chicago.

## MEMORANDUM AND ORDER

ROBSON, Senior District Judge.

This cause is before the court on the crossmotions of plaintiff Seymour A. Oliff; defendant Exchange International Corporation [hereinafter EIC]; and defendants Edward L. Sax,[1] Samuel Wm. Sax, and the Continental Illinois National Bank and Trust Company of Chicago,[2] as co-trustees of the trusts of George D. Sax, for summary judgment.[3] For the reasons hereinafter stated, the motion of the plaintiff is grant-

---

1. On January 30, 1978, the court, pursuant to a motion by the parties, substituted Edward L. Sax, as successor co-trustee of the trus s of George D. Sax, as party defendant for Rho la B. Sax, deceased, co-trustee of the trusts of George Sax. The suggestion of the dea h of Rhoda Sax was filed on January 4, 1978, p irsuant to Fed.R.Civ.P. 25(a)(1). The parties advised the court that the complaint in this cause was not extinguished by the death of Rhoda Sax. They further advised the court that Edward L. Sax was named as successor co-trustee under A7.01 and A7.02 of the Last Will of George Sax and that he had accepted his appointment upon the death of Rhoda Sax.

2. On January 30, 1978, the court substituted the Continental Illinois National Bank and Trust Company of Chicago, as successor co-trustee of the trusts of George D. Sax, as party defendant for the Exchange National Bank of Chicago, co-trustee of the trusts of George D. Sax. The court ordered substitution after the parties advised the court that the Exchange National Bank of Chicago had resigned as co-trustee cf the trusts of George D. Sax and that the Continental Illinois National Bank and Trust Company of Chicago had accepted appointment as successor co-trustee of the trusts.

3. This court entered an order on February 11, 1977, pursuant to a motion by the originally named defendants, to substitute as parties defendant, Samuel Wm. Sax, Rhoda Sax, and the Exchange National Bank of Chicago, as co-trustees of the Marital and Residuary Trusts under the Last Will of George D. Sax for Samuel Wm. Sax, Rhoda Sax, and the Exchange National Bank of Chicago, as co-executors of the estate of George Sax. Subsequently, Edward L. Sax and the Continental Illinois National Bank and Trust Company of Chicago were substituted as successor co-trustees of the trusts of George D. Sax for Rhoda B. Sax and the Exchange National Bank of Chicago. *See* notes 1 & 2 *supra*. The attorney for the successor co-trustees represented to the court on February 13, 1978, that these co-trustees formally adopted the briefs submitted by their predecessor co-trustees. Because Rhoda B. Sax and the Exchange National Bank were co-trustees at the time of the alleged purchase and sale and were the co-trustees that answered the complaint and submitted their motions for summary judgment with accompanying memoranda, the court will refer to Rhoda B. Sax and the Exchange National Bank rather than Edward L. Sax and the Continental Illinois National Bank and Trust Company as two of the co-trustees of the trusts of George D. Sax.

ed, and the motions of the defendants are denied.

Plaintiff has brought this action against EIC and the co-trustees of the trusts of George D. Sax—Edward L. Sax, Samuel Wm. Sax, and the Continental Illinois National Bank and Trust Company of Chicago. The jurisdiction of this court is invoked pursuant to section 27 of the Securities Exchange Act of 1934 (15 U.S.C. § 78aa) and is not disputed.

Plaintiff's action is a stockholder derivative suit in the name of and on behalf of the defendant EIC. Pursuant to section 16(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78p(b)) [hereinafter section 16(b)],[4] he seeks to recover profits and interest from an alleged purchase and sale within six months by the co-executors of the estate of George D. Sax as 10 percent beneficial owners of EIC stock. Plaintiff states that he requested defendant EIC to compel an accounting by the co-executors of the estate of George D. Sax for the profits. Defendant EIC responded to plaintiff in a letter of November 23, 1976, that it would take no action with respect to the estate's transactions involving EIC stock. After EIC's letter, plaintiff brought his suit. Plaintiff seeks judgment in the amount of $115,976, the profit from the alleged purchase and sale, as well as interest and fees.

Plaintiff and defendants have filed cross-motions for summary judgment with briefs supporting, answering, and replying. Edward L. Sax and the Continental Illinois National Bank and Trust Company of Chicago, having been substituted as trustees of the trusts of George Sax for Rhoda Sax and Exchange National Bank of Chicago [hereinafter ENB], respectively, have formally adopted the motions and briefs of their predecessor trustees (see notes 1–3 supra).

All parties agree that the transactions alleged to be a purchase and sale did occur within a six-month period. The parties further agree that the estate of George Sax was a beneficial owner of over 10 percent of the common stock of EIC. This percentage of stock ownership subjects the estate to the potential for section 16(b) liability. The only dispute is over whether the legal effect of the stock transactions, in which the estate of George Sax was involved, constituted a purchase and sale within the ambit of section 16(b). Neither party raises a material issue of fact; their disagreement is over the legal significance of the facts. Thus, with all parties moving for summary judgment and conceding no genuine issue of material fact, and the court agreeing, this case will be decided as a matter of law. *Illinois Migrant Council v. Campbell Soup Co.*, 438 F.Supp. 222, 225 (N.D.Ill.1977).

## BACKGROUND

### Alleged Purchase

George Sax, deceased, made two transfers of shares of EIC stock to the Sax Foundation in 1972 and 1973, respectively.

---

4. Section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b), provides:

 For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) within any period of less than six months, unless such security was acquired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security purchased or of not repurchasing the security sold for a period exceeding six months. Suit

 to recover such profit may be instituted at law or in equity in any court of competent jurisdiction by the issuer, or by the owner of any security of the issuer in the name and in behalf of the issuer if the issuer shall fail or refuse to bring such suit within sixty days after request or shall fail diligently to prosecute the same thereafter; but no such suit shall be brought more than two years after the date such profit was realized. This subsection shall not be construed to cover any transaction where such beneficial owner was not such both at the time of the purchase and sale, or the sale and purchase, of the security involved, or any transaction or transactions which the Commission by rules and regulations may exempt as not comprehended within the purpose of this subsection.

These transfers were found to be acts of "self-dealing" by the Internal Revenue Service. After the Internal Revenue Service's determination, the estate of George Sax rescinded the acts of self-dealing and obtained the EIC shares previously transferred from the Sax Foundation. This transaction is alleged by the plaintiff to be a purchase within the meaning of section 16(b).

George Sax established the Sax Foundation and prior to his death on March 12, 1974, was one of the trustees of the Sax Foundation.[5] At all times relevant to this litigation, the trustees, in addition to the estate of George Sax, were Dr. Harry Benaron, Barnet Hodes, Rhoda B. Sax, and Samuel Wm. Sax.

On December 28, 1972, George Sax donated $75,000 in cash to the Sax Foundation. On January 4, 1973, he sold 6,818 shares of EIC stock for $74,998 to Langill & Co., a registered broker-dealer. On the same day, the Foundation bought the 6,818 shares of EIC stock from Langill & Co. for $75,098.

A similar transaction took place on November 28, 1973, when George Sax sold 7,500 shares of EIC stock to Langill & Co. for $75,000. On the same day, the Foundation purchased 7,500 shares of EIC stock from Langill & Co. for $75,100, with payment being made on December 4, 1973. On December 3, 1973, George Sax gave $75,000 in cash to the Foundation.

The Internal Revenue Service determined that the stock transfers by George Sax to the Sax Foundation constituted taxable acts of "self-dealing" by a disqualified person with a private foundation, within the meaning of section 4941 of the Internal Revenue Code. By letter of July 28, 1975, from the Internal Revenue Service to the estate of George Sax and the trustees of the Sax Foundation, tax assessments on the estate and the trustees of the Sax Foundation were proposed. The proposed tax assessments were due only if the acts of self-dealing were not "undone" within the correction period specified in section 4941(e)(3) and (e)(4) of the Internal Revenue Code (a ninety-day correction period after notice).

An initial protest was filed to the assessment. Nonetheless, after an IRS District Conference, Joseph Golman, the certified public accountant for the estate of George Sax, the co-executors of the estate, and the attorneys for the estate concluded that the IRS position could not be successfully challenged. Accordingly, on December 22, 1975, the estate of George Sax paid the Sax Foundation $150,198 (the amount of money paid by the Foundation to Langill & Co. for the EIC stock), and the Foundation transferred 14,318 shares of EIC stock (the same number of shares of EIC stock as were sold to it by Langill & Co.) to the estate of George Sax. The shares were transferred at a price of $10.49 per share, the same price at which they were transferred two to three years previously. After the transfer of EIC stock to the estate, the Internal Revenue Service abated the proposed tax assessments, as the transaction constituted a correction of George Sax's acts of self-dealing.

*Alleged Sale*

In January and February of 1976, Rhoda Sax and the majority co-executors of the estate of George Sax filed separate petitions for court approval of offers made to purchase EIC stock held by the estate. On February 9, 1976, a judge of the Cook County probate court, upon hearing the parties' petitions, determined that the shares of EIC stock should be sold to the highest bidder through a private judicial sale. On May 7, 1976, the sale of the shares of EIC stock was made pursuant to secret bids submitted to the probate court. This transaction is alleged by the plaintiff to be a sale within section 16(b).

The Last Will of George D. Sax was executed on May 13, 1971, and was admitted to probate on May 15, 1974. By Article

---

5. The estate of George Sax was substituted as a trustee of the Sax Foundation upon George Sax's death in 1974.

A–VII of the will, Rhoda Sax, Samuel Wm. Sax, and ENB were appointed as executors of the estate. The same parties were appointed as testamentary trustees of George Sax's marital, family, and other trusts. Edward L. Sax was named as the successor trustee to Rhoda Sax and Samuel Wm. Sax. (Section A7.02). Provision was made for the Exchange National Bank to resign and appoint a successor trustee. (Section A7.03). Successor trustees were vested with the rights and obligations of the trustees named in the will. (Section A7.03). By the will, the majority of the executors or trustees were authorized to act on behalf of the estate. The nonconcurring executor or trustee was relieved of responsibility and liability for any such action or inaction. (Section A7.05). As the wife of George Sax, Rhoda Sax was given the power, pursuant to the will, to determine whether to retain any unproductive property. The executor or trustee, upon notice, was directed to cause this property to become productive by sale within a reasonable time. (Section A7.11). The trustee was given complete power to sell personal property at any time through a public or private sale. (Section B2.02(B)). The executor was given the same power as the trustee with respect to the estate. In addition, the will provided that the executor could exercise its power without prior approval of any court. (Section B2.03). The co-executors—Rhoda Sax, Samuel Wm. Sax, and ENB—were issued letters testamentary on May 15, 1974. The transactions herein at issue concern the defendants in their capacity as executors of the estate of George Sax. This action has been brought against the defendants in their present capacity as testamentary trustees of the trusts of George Sax (*see* note 3 *supra*).

The principal asset of the estate of George Sax was 190,727 shares of common stock of the Exchange International Corporation, whose principal asset was the Exchange National Bank of Chicago. Included in these shares were the 14,318 shares of EIC stock obtained by the estate from the Sax Foundation after the Internal Revenue Service's determination of acts of self-deal-

ing by George Sax. The administration of the estate of George Sax was being handled by the Trust Department of ENB with Michael D. Goodman as the trust officer in charge. In Michael Goodman's report for ENB's Trust Investment Committee of December 4, 1975, the Committee recommended that the estate's shares of EIC stock should be retained by the estate for ultimate distribution at a later time to the Family and Marital Trusts. By letter of December 24, 1975, Rhoda Sax, by her attorney, Shepard Broad, registered her disagreement with the recommendations made by the Trust Officer.

Shortly afterwards, on January 8, 1976, an offer to purchase the EIC shares held by the estate was made by Ira Kaufman [hereinafter Kaufman offer], through Rodman & Renshaw as the broker-dealer, at a price of $14.00 per share. Rhoda Sax signed and accepted the offer on the same day. Duplicate originals of the Kaufman order were delivered to ENB and Samuel Sax as the other co-executors of the estate of George Sax. The offer was submitted and discussed at a meeting of the Trust Investment Committee of ENB on January 15, 1976. The Chairman of the Committee, Maurice A. Riskind, "stated that in his opinion there are many SEC and other legal involvements in connection with this offer and that, therefore, before the Committee discusses it, Mr. Novak, on behalf of the Trust Department, should obtain a written opinion from general counsel with respect to such matters in order that the Trust Department and the Committee be fully advised in acting upon said offer." (Minutes of the Trust Investment Committee of ENB for January 15, 1976). The court has not been apprised whether any written opinion was obtained from general counsel with respect to SEC or other legal involvements. Ira Kaufman, by his attorney, Robert Dunn Glick of Schwartz, Cooper, Kolb & Gaynor, by letter of January 14, 1976, to Byron Miller of D'Ancona, Pflaum, Wyatt & Riskind stated: "As counsel for the investors, we are not aware of any applicable provision of the Securities Laws which may

affect the acceptance of the offer. We are, however, available immediately to meet with you to discuss this matter." There is no indication whether Mr. Glick was aware of the transfer of shares of EIC stock from the Sax Foundation to the estate in December of 1975.

On January 21, 1976, Rhoda Sax petitioned the Probate Division of the Circuit Court of Cook County for an order directing the executors of the estate of George Sax to sell the estate's shares of EIC stock at a private sale for $14.00 per share based on the Kaufman offer or, alternatively, "the sale of the Shares for more than $14 if another purchaser can be found." She stated in her petition at paragraph 6:

The question of whether there were any SEC problems or involvements should not be a reason for deferral, because the persons making the offer have through their counsel offered to petitioner's counsel to meet any and all conditions required under the SEC laws and regulations, and this fact has been communicated to the Bank, and counsel for those making the offer have offered to meet the Bank on all such questions, see their letter attached Exhibit C.

The Exhibit C referred to is the letter, previously excerpted in relevant part, of Robert Glick to Byron Miller.

On January 21, 1976, Samuel Sax and ENB, as majority co-executors of the estate of George Sax, petitioned the Probate Division of the Circuit Court of Cook County. They sought approval of acceptance on their part of an offer dated January 20, 1976, from a Swiss bank for the purchase of the EIC shares held by the estate for a price of $14.25 a share [hereinafter Pallas offer]. The majority co-executors stated in their petition that their acceptance of the offer was valid and binding under the provisions of the will of George Sax. The majority co-executors stated that as Rhoda Sax's petition to the court asked for as an alternative, the sale of the shares for more than $14.00 if another purchaser could be found, its acceptance of an offer at $14.25 per share rendered Rhoda Sax's petition

moot. They further stated that the Pallas offer was in full compliance with all federal and state laws.

The negotiations preceding the Pallas offer were commenced subsequent to January 9, 1976, and resulted in the offer of January 20, 1976. The offer to purchase the shares was conditioned upon "(a) entry by a court of competent jurisdiction of a final order approving the sale of the Shares by the Estate pursuant hereto and (b) receipt by the Offeror of a satisfactory opinion letter from counsel for the Estate with respect to the legal aspects of the transaction." (Para. 2 of the Pallas offer). Para. 4 provided that "Acceptance of this offer by a majority of you shall constitute a representation and warranty by you and the Estate to the Offeror that: . . . (c) This offer has been duly accepted on behalf of the Estate and is a legal, valid and binding obligation of the Estate, enforceable in accordance with its terms." The majority co-executors did sign and accept the offer on their behalf "subject to entry by a court of competent jurisdiction of a final order approving the sale of the Shares pursuant hereto." (Page 6 of the Pallas offer). They state in their memorandum in support of their motion for summary judgment that the "subject to" clause was added to satisfy conditions of a letter of credit negotiated with the First National Bank of Chicago.

On February 4, 1976, Rhoda Sax filed an Amendment to her Petition for an Order directing the Executors to sell Certain Stock at Private Sale. The relevant sections of her petition provided:

4. Both Rhoda Sax and the other two executors have petitioned this Court to sell the 190,727 shares and therefore there is a unanimity of opinion of the executors that the Shares should be sold.

5. Rhoda Sax has now received an "AMENDED OFFER" which is attached hereto and marked Exhibit F, and that Offer is for $14.30 a share.

 . . . .

7. In the Petition Rhoda Sax prayed for, amongst other relief, the following:

 . . . . .

"(b) The sale of the Shares for more than $14 if another purchaser can be found;"

8. All of the executors having committed themselves to the sale of the Shares, and three different offers having been received within a period of a few days, the executors are all under an obligation to get the highest price for the shares, and therefore either the present highest price ($14.30) for the shares should be accepted in accordance with the attached Exhibit F or this Court should hold a sale to the highest bidder of the Shares.

WHEREFORE Rhoda Sax prays:

. . . . .

(b) The executors be ordered to accept the Offer attached as Exhibit F; or

(c) The sale of the Shares for the best price above $14.30 obtainable by bidding to be conducted by this Honorable Court; and

(d) For such other relief as to the Court shall seem meet.

The offer of $14.30 per share was made by the Kaufman group, the same party that had made an offer to the executors that Rhoda Sax had signed on January 19, 1976.

The respective petitions came up for hearing before Judge Robert Jerome Dunne of the Probate Division of the Circuit Court of Cook County on February 9, 1976. The court stated that this was a situation where assets of an estate are to be sold and where a will provides that the majority of the trustees are given power to sell the assets. As all the interested parties had petitioned the court to sell the stock, the court stated that it had nothing else to do but to order the stock for sale to the highest and best bidder. Judge Dunne further stated that sealed bids was the proper way to make the sale to avoid cutthroat bidding.

Judge Dunne asked the parties if they had any comments as to his decision. Mr. William Kirby, the attorney for Rhoda Sax, responded: "So far as Rhoda Sax is concerned, the highest price is all she is asking for, and we are satisfied with your Honor's decision." Mr. Selwyn Zun, the attorney for ENB and William Sax, responded that these executors took exception to the Judge's ruling on the ground that the Kaufman group should not have the right to bid for the stock as Rhoda Sax had entered into a secret, undisclosed agreement with this group. On the other hand, the majority co-executors were bidding for the Pallas offer with no side agreements for control. He further stated that ENB and William Sax were at least entitled to discovery before a sale of the shares took place. Judge Dunne responded that, based on his decision, he considered the motion regarding depositions as moot. Mr. Kirby added that the undisclosed agreement was already disclosed and in evidence as an exhibit attached to Kaufman's deposition.

Judge Dunne entered an order providing that:

The Court finds that the executors have all asked for sale of the stock mentioned in the petitions (1) and (2) above, and that increasing prices have been offered, and that it is in the best interest of the estate to get the highest cash bid, and that can best be accomplished by sealed bids.

The Judge further ordered that bids should be filed by February 23, 1976, and that the highest bidder would be sold the stock.

Rhoda Sax's attorneys brought an emergency motion, heard by Judge Dunne on February 11, 1976, to modify the court's order to specify that the sale would be private. At that time, the attorney for ENB and William Sax informed the court that the majority co-executors had filed a notice of appeal. Their ground for appeal was that the court lacked jurisdiction to enter any order. Judge Dunne continued Rhoda Sax's motion to February 13, 1976. At the hearing, Judge Dunne decided, after the arguments of the parties, to revise his order to add that the sale of the estate's shares of EIC stock would be by private sale. The attorney for the majority co-executors moved for a stay pending appeal. Judge Dunne denied a stay.

What followed were appeals by the majority co-executors of Judge Dunne's determination to sell the shares of EIC stock of the estate of George Sax at a private sale to the highest bidder. On February 18, 1976, the Illinois Appellate Court for the First District denied the motion of the majority co-executors to stay the court's order. On February 23, 1976, Judge Dunne reset the date for sale of the estate shares by sealed bids to March 1, 1976. On March 1, 1976, the Appellate Court, after extensive briefing, again denied the motion for a stay. On March 1, 1976, because four new bids were made, Judge Dunne continued the bids until the next day. On March 2, he reset the date for the sale. On March 3, a draft order was submitted setting the sale for March 4. On March 3, the majority co-executors petitioned the Illinois Supreme Court for leave to file a petition seeking the issuance of Writs of Prohibition and Mandamus to stop the bidding. On the morning of March 4, the Illinois Supreme Court stayed the sale pending disposition of the motion. On March 17, the Illinois Supreme Court denied the petition for Mandamus and Prohibition. On March 22, the majority co-executors filed a petition for change of venue. Rhoda Sax filed a memorandum in opposition to the petition on March 23. The court denied the petition on that date and reset the sale date to March 29, 1976.

The EIC, ENB, and Samuel Wm. Sax also brought an action in the Federal District Court for the Northern District of Illinois on February 27, 1976, challenging the Kaufman offer. They alleged violations of the Glas-Steagall Act, the Bank Holding Co. Act, and the Securities Exchange Act of 1934 by the parties making the Kaufman offer. Because the Kaufman offer was not the highest bid received, these proceedings were rendered moot. Thus, the plaintiffs voluntarily dismissed their suit on May 21, 1976.

On March 29, 1976, Judge Dunne accepted sealed bids for the sale of the 190,727 shares of the common stock of EIC held by the estate of George Sax. The highest bidder, John S. Samuels, offered to purchase the estate shares at $18.59 a share with his bid totalling approximately $3,545,614.90. On May 7, 1976, the sale of the estate shares was consummated. On May 10, the court approved the final report of sale filed and prepared by the co-executors.

On January 7, 1977, the attorneys for Rhoda Sax filed a verified petition to fix attorneys' fees with the Probate Division of the Circuit Court of Cook County. In the petition, the attorneys reiterated many of the facts here stated involving the sale of the estate shares. They stated that on the basis of the efforts of Rhoda Sax, as co-executor of the estate of George Sax, the sale resulted in increased benefit to the estate of, at a minimum, $4.59 per estate share. Their figure represented the difference between the original offer of $14.00 per share and the eventual offer of $18.59 per share accepted on the bids submitted at the time of sale. The award was sought for "the vast amount of time expended by said counsel, superlative skill and competency" in connection with the sale of the estate shares.

## APPLICABLE SECURITIES LAW

■ Plaintiff predicates his action on the application of section 16(b) of the Securities Exchange Act of 1934. Section 16(b) provides for liability of officers, directors, and beneficial owners of more than 10 percent of the listed stock of any company for any profits realized from any purchase and sale or sale and purchase of stock occurring within a six-month period. Beneficial owners of more than 10 percent of the stock of a corporation are presumed to have access to inside information and to have acted on the basis of this information in engaging in a short-swing transaction prohibited by section 16(b). *Allis-Chalmers Mfg. Co. v. Gulf & W. Indus., Inc.*, 527 F.2d 335, 347 (7th Cir. 1975), *cert. denied*, 423 U.S. 1078, 96 S.Ct. 865, 47 L.Ed.2d 89 (1976) [hereinafter *Allis-Chalmers*]. Liability is determined without considering intent, lack of motive, or improper conduct. *Reliance Electric Co. v. Emerson Electric Co.*, 404 U.S. 418, 424 n.4, 92 S.Ct. 596, 30 L.Ed.2d 575 (1972). Thus, section 16(b) liability is determined objec-

tively as a flat rule to take profits out of a class of transactions where the possibility of abuse is believed to be great. *Id.* at 422, 92 S.Ct. 596; *Kern County Land Co. v. Occidental Petroleum Corp.*, 411 U.S. 582, 592, 93 S.Ct. 1736, 36 L.Ed.2d 503 (1973) [hereinafter *Kern County*].

The parties have devoted a great deal of their arguments to the effect of the *Kern County* decision on the case at bar. In *Kern County*, one or more purchases within the meaning of section 16(b) occurred when the defendant acquired more than 10 percent of the stock of a target company pursuant to a tender offer. The issue before the Court was whether a statutory "sale" occurred either when the target of the tender offer defended itself by merging into a third company and the tender offeror then exchanged its stock for the stock of the surviving company, or when the tender offeror granted an option to the third company to purchase its shares exercisable outside of the statutory six-month period. *Id.* at 584, 93 S.Ct. 1736. The Court held that neither the exchange pursuant to the merger nor the option agreement constituted a sale within the meaning of section 16(b). *Id.* at 590–91, 93 S.Ct. 1736. The Court began its consideration of the alleged sales as unorthodox transactions to be treated differently than ordinary cash-for-stock transactions. *Id.* at 593 & n.24, 93 S.Ct. 1736. In examining unorthodox transactions, the Court stated that the congressional objective underlying section 16(b) liability had to be considered. The Court found Congress' objective to be the prevention of speculative abuse through the realization of short-swing profits based upon access to inside information. *Id.* at 594–95, 93 S.Ct. 1736.

In *Kern County*, the Court stated that the involuntary nature of the exchange of stock pursuant to a merger, coupled with the absence of the possibility of speculative abuse of inside information, excluded this exchange from section 16(b) liability. *Id.* at

600, 93 S.Ct. 1736. The Court found that the option agreement did not present a sufficient possibility of speculative abuse and an option for the exchange of stock outside of the six-month period is not generally regarded as a sale within the meaning of section 16(b). *Id.* at 601, 93 S.Ct. 1736.

The Seventh Circuit Court of Appeals has interpreted the *Kern County* decision as still recognizing that ordinary, voluntary transactions commonly recognized as purchases and sales automatically trigger the application of section 16(b) as they uniformly have in the past. *Allis-Chalmers, supra* at 351. The court stated that the objective rule for section 16(b) liability would be applied, unless the two distinguishing elements of the *Kern County* situation were present: 1) either the purchase or the sale was an unorthodox transaction, and 2) an analysis of the unorthodox transaction disclosed no possibility of short term speculative abuse. *Id.* at 351. Thus, before the *Kern County* test can be applied here, the court must determine whether either of the transactions alleged to be a purchase and sale was an unorthodox transaction.

■ The transfer of stock to the estate of George Sax in rescission of previous acts of self-dealing was not an unorthodox transaction. The Court in *Kern County, supra*, 411 U.S. at 593 n.24, 93 S.Ct. 1736, defined unorthodox transactions, with reference to Louis Loss' treatise on *Securities Regulation*, as applying to stock conversions, exchanges pursuant to mergers and other corporate reorganizations, stock reclassifications, and dealings in options, rights, and warrants.[6] There is nothing about the transfer of the shares of EIC stock from the Sax Foundation to the estate of George Sax to fit within the narrow classification of unorthodox transactions of *Kern County*. The transfer of stock to the estate increased the estate's equity ownership in EIC unlike unorthodox transactions which do not change proportionate equity

---

**6.** Louis Loss identifies "unorthodox" purchase and sale transactions as transactions pursuant to conversions, mergers, and reclassifications.

L. Loss, *Securities Regulation II* 1069–70 (2d ed. 1961) [hereinafter L. Loss].

ownership. The motivation of acting pursuant to an internal revenue service ruling and the potential imposition of a tax penalty may be relevant to a "forced purchase" defense, as will be discussed *infra.* Nonetheless, this type of motivation does not make the transfer of shares fall within the unorthodox transaction classification. Thus, the transfer of shares from the Sax Foundation to the estate of George Sax will be viewed as an ordinary cash-for-stock transaction.

■ Similarly, the sale of shares of EIC stock, pursuant to sealed bids through the probate court arrangement, was not an unorthodox transaction triggering the application of the *Kern County* test. In the transactions classified as unorthodox, the transactions are either responses to corporate actions such as a conversion of stock, a merger, and a reclassification of stock, or options, rights, and warrants not generally regarded to be sales as they are usually exercisable outside of the statutory six-month period. In the transaction here, there was neither a corporate action as the catalyst for the transaction nor a transaction exercisable outside of the six-month period. Instead, the catalyst for the sale of the shares of EIC stock was the initiation of the proceedings in the probate court by the executors of the estate of George Sax, the defendants here, and the transaction took place within the six-month period after an alleged purchase. The participation of the probate court, a third party, only after the petitions for sale were filed, did not make the transaction unorthodox. Whether the court's participation made the sale involuntary is a separate question to be discussed *infra.* In addition, the transfer of stock by the estate decreased the estate's equity ownership in EIC unlike unorthodox transactions which do not change proportionate equity ownership within the six-month period. Thus, the sale of shares of the estate of George Sax, pursuant to the probate court arrangement, will be treated as an orthodox cash-for-stock transaction.

Although the *Kern County* test is not applicable because neither the alleged purchase nor the alleged sale constitutes an unorthodox transaction, some federal courts have still taken a "pragmatic approach" to determine whether the transactions involved presented the possibility of speculative abuse. *See, e. g., Makofsky v. Ultra Dynamics Corp.,* 383 F.Supp. 631, 638 (S.D. N.Y.1974) [hereinafter *Makofsky*]. A pragmatic approach will be utilized here so as to take into account the underlying policy of section 16(b) of preventing the misuse of inside information for purposes of speculative abuse. Wentz, *Refining A Crude Rule: The Pragmatic Approach to Section 16(b) of the Securities Exchange Act of 1934,* 70 Nw.L.Rev. 221, 272 (1973) [hereinafter Wentz].

## DEFENSES TO THE ALLEGED PURCHASE

Defendants state that the correction of the acts of self-dealing by George Sax through the transfer of EIC stock from the Sax Foundation to the estate of George Sax does not constitute a purchase within the meaning of section 16(b). They argue that the transfer of shares of EIC stock from the Sax Foundation to the estate of George Sax was: 1) a rescission of the acts of self-dealing that took place in 1973 so that the transaction in 1976 was not a purchase; 2) not a purchase as the acts of self-dealing that took place in 1973 were ultra vires and voidable under Illinois law; and 3) an involuntary, forced, and compelled transaction made solely to avoid the imposition of enormous additional taxes on the estate of George Sax. Plaintiff admits that the transaction was a rescission of the previous acts of self-dealing, but counters that the rescission did not take the transfer of shares back to the estate of George Sax out of the ambit of section 16(b). He also contends that the defense of voidable and ultra vires acts under Illinois law does not prevent section 16(b) liability, because that section is penal as well as remedial. Furthermore, the defense of a forced purchase to avoid substantial tax liability is not supported by the facts because the estate "maximized its opportunity to profit from this set of circumstances and also success-

fully avoided payment to the Internal Revenue Service of a tax penalty."

*Rescission*

The plaintiff admits that the transaction in 1975 resulting in the transfer of stock from the Sax Foundation to the estate of George Sax constituted a rescission of the 1972 and 1973 acts of self-dealing by George Sax. The issue is thus not whether a rescission took place but whether the particular rescission constituted a purchase within the meaning of section 16(b).

In *Volk v. Zlotoff*, 285 F.Supp. 650, 651 (S.D.N.Y.1968) [hereinafter *Volk*], despite the mutual rescission of the exercise of a stock purchase option, the court entered summary judgment for the plaintiff finding a section 16(b) violation. The court held that the subsequent rescission of the exercise of the stock options did not remove the rescinded transactions from the reach of section 16(b). *Id.* at 657. In the case at bar, the rescinding transaction rather than the rescinded transaction is the one sought to be determined a purchase by the plaintiff. Nonetheless, here, as in *Volk*, mutual rescission is raised as a defense to immunize the transfer of shares of EIC stock from the Sax Foundation to the estate of George Sax from section 16(b) liability. Here, we find as the court in *Volk* similarly found, that the mutual rescission of George Sax's acts of self-dealing did not immunize the rescinding transaction from section 16(b) liability.

In *Hennesey v. Fein*, 184 F.Supp. 86 (S.D.N.Y.1958) [hereinafter *Hennesey*], the court held that the subsequent rescission of stock transactions alleged to be purchases within section 16(b) by a judicially approved settlement in a sharply contested shareholder's derivative suit was a res judicata determination taking the purchases outside of section 16(b) liability. The determination was res judicata as all the parties relevant to the section 16(b) inquiry were parties to the judicially approved settlement. *Id.* at 89–90. The court in *Volk, supra* at 658, held that the *Hennesey* rescission defense was limited to the circumstances of a judicially approved settlement. The court in *Hennesey, supra* at 90, itself stated that not all consummated agreements to rescind constitute a defense to section 16(b) actions. Thus, the *Hennesey* defense is limited to a judicially approved rescission in a sharply contested proceeding involving all the parties relevant to a section 16(b) determination. Here, the rescission of the acts of self-dealing by George Sax was made to avoid income tax liability. The rescission was not a settlement agreement of federal securities law claims as was true in *Hennesey*. There, the stockholders were parties to the rescission so that they were bound by res judicata, which is not the case here. Accordingly, the approach of *Volk* rather than *Hennesey* is applicable so that the mutual rescission is not a defense to this section 16(b) action.

Defendants argue that the decision of *Kahansky v. Emerson Radio & Phonograph Corp.*, 184 F.Supp. 90 (S.D.N.Y.1960) [hereinafter *Kahansky*], is controlling here. Defendants state that in *Kahansky* rescission was by agreement of the parties without a court order, whereby the rescinding transaction was treated as a nullification of the first transaction so that it did not constitute a transaction subject to section 16(b) liability. Taking this approach, the 1975 rescission of the 1972 and 1973 acts of self-dealing constituted a nullification of the earlier transactions and was thus not a purchase for purposes of section 16(b). Plaintiff counters stating that *Kahansky* did not involve two separate transactions as are present here so that this rescission defense to a section 16(b) action is not applicable. Defendants in their reply memoranda argue that *Kahansky* did involve two separate transactions so that its holding is directly applicable here.

In *Kahansky*, a written agreement was entered into whereby the Emerson Corporation, the defendant in the section 16(b) action, contracted to buy a controlling interest in Webcor, another corporation. Two months later, pursuant to a further agreement, the stock was returned with Emerson receiving its purchase price back along with

a declared cash dividend and a sum of money representing damages to Emerson. These transactions were alleged to be, respectively, a purchase and a sale within section 16(b). Summary judgment was entered for the defendant, as the second transaction was held to constitute a rescission of the first transaction. Emerson bought the stock of Webcor pursuant to a takeover bid. Webcor failed to complete other conditions of the purchase agreement so that Emerson was blocked in its takeover bid. Emerson contended that Webcor's failure to fulfill the purchase agreement meant that its stock acquisition was, at most, a conditional purchase followed by a complete rescission. The court found that the failure to obtain the fulfillment of all the conditions did not constitute a cancellation of the purchase agreement but gave Emerson the right to rescind by returning the stock. Nonetheless, it found that the settlement agreement of the contract breach reached after arms length negotiations, was not a sale within section 16(b). *Id.* at 94.

The courts in *Volk* and *Hennesey* stated that the fact of a rescission does not automatically remove a transaction from section 16(b) liability. Thus, as the *Hennesey* defense is inapplicable, rescission will be a defense here to a section 16(b) violation only if the *Kahansky* situation is present. The rescission in *Kahansky* was a settlement of a bona fide breach of contract dispute. The rescission thus did not constitute a transaction with the possibility of speculative abuse for section 16(b) liability to attach. Here, the rescission was not a result of a disagreement and settlement between contracting parties. Instead, the rescission resulted from the intervention of a third party, the Internal Revenue Service, to set aside the initial sale of shares of EIC stock to the Sax Foundation as acts of self-dealing by George Sax. Instead of the two intimately related transactions in *Ka-*

*hansky*, here there were two separate fully consummated transactions related only because of a determination that the first transaction violated tax laws.

The *Kahansky* decision is further distinguishable from the case at bar. First, the rescission in *Kahansky*, made two months after the initial transaction, is a substantially different situation from the two to three year separation between the initial transaction here and the rescission. The rescission in *Kahansky* did not substantially change the status quo, while the rescission here restored stock to the estate that had been out of its possession for over two years and for which the lack of dispute about the initial transfer between the estate and the Sax Foundation gave the estate no expectation of ever receiving stock back. The status quo had already changed before the rescission took place. This time difference of two years is especially significant considering that the shares were returned to the estate at the same price at which they were transferred, despite the numerous offers to purchase the shares at a substantially higher price within the six months subsequent to the rescission. Second, the *Kahansky* rescission was held to be outside of section 16(b) because it was an arms length transaction so that taking the transaction outside of section 16(b) did not frustrate the statutory purpose. Taking the transaction here out of section 16(b) would frustrate the statutory purpose of preventing the possibility of speculative abuse as the rescission was not an arms length transaction. The insiders sought to be held liable pursuant to section 16(b) constituted the majority of the trustees of the Sax Foundation,[7] which was the seller of the stock, and also were the purchasers of the stock in the rescinding transaction. Where the insiders are on both ends of the rescinding transaction, the possibility of speculative abuse is present. L. Loss, *supra* at 1069–70. Accordingly, the *Kahansky* defense is not applicable here.

---

7. The Sax Foundation had five trustees at all times relevant to this litigation. These trustees were George Sax (the estate was substituted as trustee upon George Sax's death in 1974), Rhoda B. Sax, Samuel Wm. Sax, Dr. Harry Benar-

on, and Barnet Hodes. The trustees of the estate of George Sax at the time of the alleged purchase were Samuel Wm. Sax, Rhoda Sax, and the Exchange National Bank of Chicago.

Defendants argue that *Landy v. United Fruit Co.*, 305 F.Supp. 254 (D.N.J.1969), is directly applicable as a rescission where a defendant was found not to have violated section 16(b). The court held that a price adjustment between contracting parties in the purchase of stock did not constitute a sale within the meaning of section 16(b). The court further stated that the alleged sale was not a rescission of the earlier transaction but that, if it was a rescission, it would treat the transaction the same way as the court did in *Kahansky*. *Id.* at 257. The facts of *Landy* are similar to *Kahansky* in that both involved a contract with the rescinding transaction intimately related to the contractual terms of the initial agreement. As previously stated, the case here is not a breach of contract situation. Because the facts are inapposite here, the *Landy* dicta's acceptance of the *Kahansky* defense in similar circumstances has no effect on this decision.

In sum, the fact that the purchase of EIC stock by the estate of George Sax from the Sax Foundation constituted a rescission of George Sax's acts of self-dealing for purposes of the tax law does not take this transaction out of the reach of section 16(b). As stated in *Volk, supra* at 651, mutual rescission does not immunize a transaction from section 16(b) liability. This is especially so where, as here, the possibility of speculative abuse is present because the parties sought to be held liable under section 16(b) are in control of both ends of the rescinding transaction. A further determination of actual speculative abuse is not necessary for a section 16(b) determination.

### Voidable and Ultra Vires under Illinois Law

Defendant majority co-executors argue that, because the 1972 and 1973 acts of self-dealing are voidable and ultra vires under Illinois law, they were under a duty to rescind the previous transactions so that the rescission cannot be a purchase within the meaning of section 16(b).[8] The plaintiff counters that this argument is without merit because section 16(b) is both penal and remedial and because defendant's position is absurd: reliance on one illegal act cannot be an affirmative defense to a second illegal act.

The court has neither been made aware of, nor has it found on its own examination, any case dealing with the rescission of an ultra vires act and the application of federal securities law. The determination that an act is illegal under state law and the Internal Revenue Code does not make the rescission of that act free from federal securities law problems. The application of section 16(b) is not subject to the alleged duty of the Sax Foundation and the estate of George Sax under state law to set aside their previous illegal transactions. The exercise of the duty to rescind under Illinois law does not immunize the rescinding transaction from securities law liability. Furthermore, as plaintiff points out, the application of section 16(b) is both penal and remedial. *Epstein v. Shindler*, 200 F.Supp. 836, 837 (S.D.N.Y.1961). Thus, if a violation of section 16(b) is otherwise shown, the fact that other state or federal laws may have affected a penalty or caused defendants in a section 16(b) proceeding to take a particular action does not prevent a finding of section 16(b) liability. Accordingly, the defense of acting to rescind a voidable and ultra vires act under Illinois law does not take the transaction here out of the reach of section 16(b).

### Involuntary, Forced, and Compelled Transaction

The defendant majority co-trustees argue that the transfer of stock from the Sax Foundation to the estate of George Sax did not constitute a purchase within section 16(b) because the transaction was involuntary, forced, and compelled. They argue that the estate was forced to purchase the stock of EIC to avoid the imposition of enormous additional taxes on the estate.

---

**8.** Ill.Rev.Stat. ch. 148, § 51(1)(a) prohibits a trustee of a private foundation from engaging in any act of self-dealing as defined in section 4941(d) of the Internal Revenue Code.

The plaintiff responds that the stock transaction caused no detriment to the estate, so that the transaction was not involuntary, forced, or compelled for purposes of the application of section 16(b).

The Internal Revenue Service informed the estate of George Sax and the trustees of the Sax Foundation by letter of July 28, 1975, that tax assessments would be made on the estate and the Sax Foundation if George Sax's acts of self-dealing were not corrected by a retransfer of the shares of EIC stock to the estate. The tax penalty to be levied against the estate under section 4941 of the Internal Revenue Code was 205 percent of the money paid by the Foundation for the two purchases of the EIC stock (i. e., $307,805.90). An additional penalty was to be assessed against the four surviving trustees of the Sax Foundation of $20,-000 each. On December 22, 1975, the estate paid the Sax Foundation $150,198 and had transferred to it 14,318 shares of EIC stock. This transaction abated the proposed tax assessments.

 Although the income tax reason for the purchase is here considered, the income tax rule pursuant to which the estate decided to "undo" the acts of self-dealing does not control the determination of liability under section 16(b). *Blau v. Mission Corp.,* 212 F.2d 77, 80 (2d Cir. 1954), *cert. denied,* 347 U.S. 1016, 74 S.Ct. 872, 98 L.Ed. 1138 (1954). Thus, the mere fact that the estate repurchased EIC stock from the Sax Foundation to avoid the imposition of a tax penalty does not make the purchase involuntary.

Defendants cite *Ferraiolo v. Newman,* 259 F.2d 342 (6th Cir. 1958), *cert. denied,* 359 U.S. 927, 79 S.Ct. 606, 3 L.Ed.2d 629 (1959), and *Lynam v. Livingston,* 276 F.Supp. 104 (D.Del.1967), in support of their proposition that the exchange of shares of EIC between the Sax Foundation and the estate of George Sax was involuntary, forced, and compelled. Both cases involved the conversion of preferred stock into common stock at the time that the stock was called for redemption. The courts found the conversion situation to be a forced surrender resulting in no change in the proportional equity ownership and with no money being paid by the holder at that time. Neither conversion was held to be a transaction subject to section 16(b) liability. *Ferraiolo v. Newman, supra* at 346; *Lynam v. Livingston, supra* at 106.

Plaintiff correctly points out that the issue in both *Ferraiolo v. Newman, supra,* and *Lynam v. Livingston, supra,* whether conversion of convertible equities into common stock is within section 16(b) is now moot. Securities and Exchange Commission Rule 16(b)–9 now provides a clear exemption from the application of section 16(b) for transactions involving conversion of equity securities. Defendants, nonetheless, argue that the "economic compulsion" approach of these cases is applicable here. In both cases, the holder of the preferred shares would have lost a substantial amount of money if the shares were redeemed rather than converted as they had done. *Ferraiolo v. Newman, supra* at 346; *Lynam v. Livingston, supra* at 106.

The court is of the opinion that the economic necessity approach of these cases is tied to the lack of the possibility of speculative abuse in the conversion situation, a position which the Securities and Exchange Commission has acquiesced in since these decisions. With a conversion situation the actual purchase of the shares takes place a substantial time prior to the conversion at the time of redemption. The court in *Ferraiolo v. Newman, supra* at 346, pointed out that no opportunity for profit was created by the redemption that had not been present from the time of the initial purchase. Here the opportunity for profit was possible only after the shares of EIC stock were purchased by the estate. The defendants would have lost a great deal of money if they had not purchased the shares of EIC stock from the Sax Foundation not because of their investment but because of a tax penalty. The transaction here not only freed the estate from substantial tax liability but it also made it possible for the estate to sell these shares with the other shares held by the estate at a substantially higher

price than the price at which they were obtained from the Sax Foundation. A sale was made soon after. Unlike a conversion, the transaction here increased the proportional equity ownership of the estate of George Sax in EIC. In these circumstances, the potential for speculative abuse is present.

■ Despite the tax reasons for the transfer of EIC stock from the Sax Foundation to the estate, the defendants had control over both ends of the transaction. Thus, unlike the conversion situation, the executor of the estate of George Sax had the power to determine the price of the exchange. In fact, rescinding the acts of self-dealing at a price of $10.49 a share seems to have shortchanged the Sax Foundation. The stock had been transferred to the Foundation at the price of $10.49 a share two to three years earlier, while offers were made to purchase the same stock for $14 only one month later and the stock was sold at $18.59 a share within six months of this transaction. This court cannot hold that the transfer of stock was compelled by economic necessity so as to make section 16(b) inoperative.

The transfer of stock to the estate of George Sax, made to avoid the imposition of a tax penalty, is similar to the situation in *Whiting v. Dow Chemical Co.*, 523 F.2d 680 (2d Cir. 1975). In *Whiting*, the court found section 16(b) liability even though the defendant acted to avoid the threat of a new tax bill with anticipated, increased tax assessments. *Id.* at 689. Similarly, in the case at bar, the possibility of a tax penalty assessment did not make the purchase of stock by the estate of George Sax involuntary so as to fall outside of the scope of section 16(b).

In *Western Auto Supply Co. v. Gamble-Skogmo, Inc.*, 348 F.2d 736, 742 (8th Cir. 1965), *cert. denied*, 382 U.S. 987, 86 S.Ct. 556, 15 L.Ed.2d 475 (1966), the defendant argued that its sale of stock was compelled by the government's antitrust action. The defendant had voluntarily entered into a consent decree with the government that included the sale of stock. The court held

that the pendency of the action did not justify giving the term "sale" any other than its ordinary meaning so that the transaction was not compelled. *Id.* at 742. Similarly, despite the pendency of the Internal Revenue Service determination, the transfer of shares of EIC stock to the estate of George Sax was not compelled so as to fall outside of the meaning of section 16(b).

■ In conclusion, the defenses asserted by the defendants are not applicable to the rescission especially because the circumstances suggest the possibility of speculative abuse. Accordingly, the transfer of stock from the Sax Foundation to the estate of George Sax on December 22, 1975, is a purchase for the purposes of section 16(b).

## DEFENSES TO THE ALLEGED SALE

Defendants state that the alleged sale does not constitute a sale within the meaning of section 16(b). They argue that the sale of stock of the EIC corporation was involuntary, forced, and compelled. The defendants state that under Illinois law the court was actually the seller, and the executors were merely its agents so that no sale can be attributed to the co-executors for purposes of section 16(b) liability. The majority co-executors state that they bitterly, vigorously, and unremittingly opposed the court-ordered sale in every possible legal forum and that they never conceded the probate court's jurisdiction to order the EIC stock sold. They were thus deprived of any control over the timing, method, price, or terms of the sale or the identity of the purchaser. Rhoda Sax adds that there was no possibility of speculative abuse because the executors were unable to control, or at least to predict, the certainty of the terms, conditions, timing, and price of both the purchase and sale. Rhoda Sax further states that she, as minority co-trustee, under the will of George Sax, was wholly powerless to effectuate the sale of the estate shares and can thus not be held liable under section 16(b).

The plaintiff responds that there was a sale within section 16(b). The possibility of

speculative abuse existed as the co-executors had access to inside information, and they initiated and provided the moving force behind the sale to advance their own personal business interests. The conflict of interest between the co-executors evidenced differing personal business interests among the executors, but it did not negate the possibility of speculative abuse. Plaintiff states that the probate judge's participation in the sale was ministerial, as neither the will of George Sax nor Illinois probate law mandate court approval as a condition precedent to the sale of personalty by an executor under a power given in a will. Plaintiff further states that the court's participation did not make the sale involuntary, forced, and compelled. The court acted only after all the co-executors affirmatively and voluntarily sought intervention by the court. This is not the case of a court initiating the proceedings, the court ordering divestiture, or a foreclosure sale.

*The Possibility of Speculative Abuse*

As previously stated herein, an underlying policy objective of section 16(b) is to prevent the possibility of speculative abuse. In determining whether a sale has taken place within section 16(b), we will examine defendants' contention that the sale of EIC stock by the estate of George Sax did not present the possibility of speculative abuse to trigger the application of section 16(b). The test for the possibility of speculative abuse is whether the executors had both access to inside information and some measure of influence over the timing and circumstances of the transaction sufficient to give the possibility of profits based on inside information. *Makofsky, supra* at 640.

The co-executors were all insiders presumed to have access to inside information for purposes of the application of section 16(b). The estate of George Sax, of which

they were co-executors, had control over more than 10 percent of the stock of EIC at the time of the transactions herein involved. In addition, Rhoda Sax admits in her answer to the plaintiff's complaint that she was personally in possession of more than 10 percent of the stock of EIC and was a director of EIC. Samuel Wm. Sax, while denying, in his answer, possession of 10 percent stock ownership in EIC during the relevant six-month period, stated, in a federal court proceeding challenging the Kaufman offer, that he had over 10 percent stock ownership during the relevant six-month period.[9] Moreover, he was an insider by nature of his position as a director, chairman of the board, and chief executive officer of EIC. As insiders, the possibility of speculative abuse was present if the co-executors of the estate of George Sax could have gained any benefit from their dealings by nature of their position so as to suggest the possibility of an advantage over other stockholders and the public generally. L. Loss, *supra* at 1069–70; Wentz, *supra* at 230 n.24.

On May 7, 1976, the date that the sale of the EIC stock of the estate of George Sax was made, EIC common stock was trading in the over-the-counter market at $9.50 bid and $11 sale. The estate received $18.59 per share. Although the disparity between the over-the-counter price and the price at which the estate's shares of EIC stock was sold may partially reflect a premium given because of the large percentage of shares of EIC stock sold, the premium also suggests the possibility of speculative abuse. The estate received a benefit substantially over what other stockholders would have received for a sale of their shares on the same day.

Rhoda Sax contends that speculative abuse cannot be shown as the co-executors did not act in a coordinated manner.

---

**9.** In the complaint filed on February 27, 1976, during the six-month period at issue, in *Exchange International Corp., et al. v. Rodman & Renshaw, Inc., et al.*, 76 C 750 (N.D.Ill.), Samuel Wm. Sax stated that he was a beneficial owner of 11.7 percent of the common stock of EIC. In the answer of Samuel Wm. Sax filed in this action on February 17, 1977, he denies being a beneficial owner of more than 10 percent of the common stock of EIC during the relevant time.

Their disagreement over the disposition of the stock concerned the suitability of the purchaser, however, and not the determination whether a sale should be held as petitions for sale were filed by all the executors. Inside information may cause insiders to act in differing manners to further their own personal interests without there being any less of a possibility of speculative abuse. The co-trustees, as insiders, may have taken adversary positions on the suitability of a purchaser for nonmonetary reasons and could have all still wanted a sale for the possibility of speculative gain without having had to act in coordination. The adversary stance among the co-executors thus did not negate the possibility of speculative abuse.

Rhoda Sax further contends that the co-executors could not have speculated as they did not control and could not predict the certainty of the terms, conditions, timing, and price of either the purchase or the sale. Implicit in any speculation, even if pursued with the use of inside information, is some uncertainty. Complete certainty of the terms of a transaction is not required for a finding of section 16(b) liability. In *Booth v. Varian Associates*, 334 F.2d 1, 5 (1st Cir. 1964), the court stated that lack of control over the date of sale did not diminish the opportunity to obtain insider profits. The lack of control over specific aspects of a transaction does not negate the fact that the co-trustees were insiders at all relevant times and could have obtained and possibly abused inside information. *Id.* The judicial involvement here did not negate the possibility of speculative abuse. The crucial question is, as pointed out by the parties and Wentz, *supra* at 251, not the control of the mechanics of the sale but whether the insider, the estate of George Sax, was forced to sell by the court. Even though the alleged sale was not an unorthodox transaction, if the estate was forced to sell,

there is less reason to find section 16(b) liability.

Apart from the special circumstances presented by "unorthodox transactions," the forced seller defense has been consistently rejected by the courts. See *Makofsky, supra* at 642; *Western Auto Supply, supra* at 742; *Alloys Unlimited, Inc. v. Gilbert*, 319 F.Supp. 617, 619 (S.D.N.Y. 1970) [hereinafter *Alloys Unlimited*]. If the sale alleged to be forced could have been made outside of the six-month period, then the possibility of speculative abuse is present and section 16(b) is applicable. *American Standard, Inc. v. Crane Co.*, 346 F.Supp. 1153, 1163 (S.D.N.Y.1971), *rev'd on other grounds*, 510 F.2d 1043 (2d Cir. 1974), *cert. denied*, 421 U.S. 1000, 95 S.Ct. 2397, 44 L.Ed.2d 667 (1975). Defendants state that they could not have controlled the timing of the sale of the EIC shares by secret bids. At the time of the probate court proceedings, defendants filed no petitions to delay the sale of EIC shares so that it would take place six months after the transaction here found to be a purchase.[10] Defendants' arguments concerning a forced sale might have merit if the defendants had attempted to delay a sale of the shares of EIC stock for a six-month period to avoid section 16(b) liability, and the court had refused a delay. Instead, Rhoda Sax, in her petition for a court order to sell the EIC shares, stated that "any SEC problems or involvements should not be a reason for deferral." In addition, the majority co-executors, in their petition for a court order to sell the EIC shares, stated that the offer made was in full compliance with all state and federal laws. Perhaps the co-executors were not aware of the possibility of section 16(b) liability. This failure, however, to be aware of the possible securities implications of a transaction certainly does not prevent the application of federal securities law. To so hold would undermine the securities law.

10. The executors of the estate of George Sax may not have believed that the rescission of George Sax's acts of self-dealing was a purchase for purposes of section 16(b). They might not have believed that there was any need to necessitate a delay of the sale of EIC

shares. Nonetheless, the executors took the risk of a section 16(b) violation by petitioning for a sale within "six months." Their beliefs are irrelevant to a determination of the legal effect of their transactions.

There is no indication that Judge Dunne would not have put over the sale of the EIC shares to avoid federal securities problems. Not being made aware of any securities problems by the attorneys for the co-executors, he acted on their desire to have the estate shares sold by trying to get the highest price possible through sealed bids. The timing of the sale remained in the hands of the co-executors as far as section 16(b) liability was concerned. The ability to control the time of the court's action allowed for the possibility of speculative abuse in the transactions engaged in. *Id.* at 1163–64; Wentz, *supra* at 252.

▮▮▮ The possibility of speculative abuse and a finding of section 16(b) liability is not governed by the form of the transaction as a sale by sealed bids at a judicial sale. Instead, the commercial substance of the transaction must be considered in order to prevent an insider from disguising the effective transfer of stock. *Bershad v. McDonough,* 428 F.2d 693, 697 (7th Cir. 1970), *cert. denied,* 400 U.S. 992, 91 S.Ct. 458, 27 L.Ed.2d 440 (1971). The commercial substance of the judicial sale by sealed bids shows a substantial monetary benefit gained by the estate and an actual sale of stock within six months of a purchase of the same corporation's shares. The benefit gained and the unexercised possibility of engineering the sale outside of the six-month period suffice to show that a possibility of speculative abuse was present. The executors had both access to inside information as insiders and sufficient influence over the timing and circumstances of the sale of the shares of EIC stock to give the possibility of profits based on inside information.

*Probate Court's Participation in the Sale*

▮▮▮ Defendants further argue that the sale of EIC shares pursuant to a private judicial sale was not a sale by the executors within the meaning of section 16(b) because under Illinois law the court is really the seller and the executor merely the court's agent. In *Berber v. Hass,* 57 Ill.App.2d 109, 116, 207 N.E.2d 96 (1st Dist. 1965), it was held that the court, which orders a sale of real estate held by a decedent's estate, is actually the seller and the executor is merely its agent. Sales covered by the Securities Exchange Act of 1934 are broadly defined to include "any contract to sell or otherwise dispose of" any security. Section 3(a)(14) of the Securities Exchange Act of 1934 (15 U.S.C. § 78c(a)(14)). The meaning of the term "sale" is a matter of federal law to be broadly construed to effectuate the purposes of section 16(b) irrespective of its meaning in other contexts. *Bershad v. McDonough, supra* at 696. Accordingly, defendants' characterization of the probate court as the seller and the executor as the court's agent in the context of probate proceedings is irrelevant to the determination whether the executor is the seller for the purposes of federal securities law.

▮▮▮ The transfer of shares by way of a judicial sale may appear involuntary, but it is sufficiently within the executors' control to permit them as insiders to use inside information unfairly. This is especially so, here, where the executors initiated the probate court proceedings by filing petitions for court approval of a sale of the EIC stock. If executors of an estate were allowed to immunize their stock transactions involving estate shares from federal securities law liability by obtaining court approval or court participation, then the purpose of section 16(b) to prevent the possibility of speculative abuse would be frustrated. *See Alloys Unlimited, supra* at 619. Thus, the characterization in Illinois law of the court as the vendor and the executor as the agent in judicial sales of real property does not preclude the application of section 16(b) to executors of an estate in a judicial sale of personal property.

▮▮▮ The will of George Sax gives the executors power to act in their sole discretion to sell any of the property of the estate. (Sections B2.02 and B2.03). The Seventh Circuit has interpreted Illinois law to be that in the course of the administration of an estate a sale of personal property to a bona fide purchaser for a valuable consideration is valid without court approv-

al. *Equitable Life Assurance Soc. v. Mallers,* 104 F.2d 567, 569 (7th Cir. 1939). Despite the will and *Mallers, supra,* Illinois statutory law now provides that an executor, by leave of court, may sell personal property of the decedent. Ill.Rev.Stat. ch. 3, § 209. The court is of the opinion that the Illinois statute mandates court approval as a condition precedent for the sale of personal property by an estate.

▇ The position of the majority co-executors is that they never conceded the probate court's jurisdiction to order the EIC stock sold. Nonetheless, the court had the power to act, and the majority co-executors voluntarily submitted to the authority of the probate court. They implicitly conceded the court's jurisdiction by filing for court approval. The decision here is based on what actually occurred, and there clearly was a sale of shares of EIC stock after the voluntary filing of petitions for sale by all of the co-executors. Thus, the issue here is whether the extent of the court participation made the sale of estate shares involuntary, forced, and compelled so that the transaction was not a sale for purposes of section 16(b).

### Involuntary, Forced, and Compelled Transaction

▇ In *Makofsky, supra* at 636, the beneficial owner of stock found to have made a sale within the meaning of section 16(b) played only a minor role in the sale that took place. Another private party, for business reasons, not only approved the sale but also engaged in direct negotiations in arranging the sale. Nonetheless, the court in *Makofsky* found that the need for approval and participation in negotiations by a third party in the actual sale did not prevent a finding of a sale for purposes of section 16(b) by the beneficial owner of stock only minimally involved in the sale. Similarly, the approval by the probate court of a sale of the shares of EIC stock and the arrangement of bids to be made secretly does not prevent the application of section 16(b) to the co-executors. The probate court did not even engage in any negotiations for the sale

of the shares which would suggest the possibility of an involuntary sale.

The court in *Makofsky, supra* at 642, stated that although the circumstances of the sale of stock seriously restricted the control by the beneficial owner of stock held to have made the sale, the record did not support the view that this party had no voice whatsoever. The court applied a "but for" test to determine whether the sale was forced by a third party so that without the action by the third party the short-swing sale would not have taken place. *Id.* What has to be determined here is whether "but for" the court's participation the sale of shares of EIC stock held by the estate of George Sax would not have taken place within a six-month period so as to be subject to section 16(b) liability.

First, both Rhoda Sax and the majority co-executors filed petitions for court approval of offers to purchase shares of EIC stock held by the estate of George Sax. All of the executors voluntarily put their "own head in the lion's mouth." *Id.* at 643. The majority co-executors state that they sought court approval only of the Pallas offer and only to satisfy the conditions of the First National Bank of Chicago. Nonetheless, their petition was filed voluntarily seeking the court's participation in the sale of the estate shares. The failure of the court to act specifically in the manner the majority co-executors desired did not negate the possibility of speculative abuse by the transaction that actually took place. This was not a compelled transaction, because the executors were not forced by the court to file their voluntary petitions for a sale of EIC stock. Thus, the "but for" was not the court's participation but the voluntary filings of the executors. "But for" the executors' petitions the sale of stock would not have been held within the six-month period.

Second, the probate court acted in a ministerial capacity in ordering the sale of shares of EIC stock that both parties to the proceeding wanted. The petitions came before the probate court on February 9, 1976. Judge Dunne stated that with all parties in

favor of a sale of the EIC shares the shares would be sold through secret bids to the highest bidder. The suggested manner of sale was made because there was disagreement as to whom the shares should be sold. The court acted ministerially by ordering a sale by sealed bids to prevent further cut-throat bidding. A bidding war was likely as the majority co-executors made a bid at $14.25 a share to counter Rhoda Sax's initial petition to sell at $14.00 a share, and then Rhoda Sax filed an amended petition to sell at $14.30 a share or to the highest bidder over $14.00. The appeals that followed by the majority co-executors were not over whether a sale of the shares should be made, as they had already filed a petition to sell the EIC shares. They challenged the court's jurisdiction to order the sale and the manner in which the sale was to take place. The probate court decision was upheld in each instance. Disputes over the mechanics of sale did not make the sale sought by all interested parties involuntary.

Third, the executors rather than the court remained the real parties in interest. The court's action approving a sale by sealed bids was not the compelling force whereby the sale of the shares of EIC stock had to take place within a six-month period of the transaction herein found to be a purchase. There is nothing about the probate court's order that would have prevented the delay of the transaction until after the six-month period had run. The executors, the real parties in interest, never sought to delay the sale to avoid the securities law implications. Thus, they retained at least some power to avoid a section 16(b) violation. *Makofsky, supra* at 643. In *Alloys Unlimited, supra* at 619, the court held that a defendant had made a sale within the meaning of section 16(b) when a bank, a third party, sold stock pledged to it by the defendant. The sale by the bank constituted a sale by the defendant, irrespective of whether defendant had the freedom to act to obtain refinancing so as to prevent the sale. The defendant remained the real party in interest for purposes of section 16(b), just as the executors remained the real parties in interest in the sale through sealed bids by the court.

The executors' initiation of probate court proceedings for a sale of shares of EIC stock and their retention of some power to get out of a sale within a six-month period precludes the application of a forced seller defense to the circumstances of this case. The sale of estate shares through the private judicial sale was not involuntary, forced, or compelled. Section 16(b) is thus applicable to the transaction.

*Liability of Rhoda Sax as Minority Co-executor*

Rhoda Sax states that as a minority co-executor she was wholly powerless under the will of George Sax to effectuate the sale of estate shares (Section A7.05), so that she cannot be held liable under section 16(b). The court's review of the participation by Rhoda Sax in the sale of the shares of EIC stock shows that she is equally liable under section 16(b) with the other executors.

Rhoda Sax first petitioned the probate court for an order directing the executors of the estate of George Sax to sell the estate's shares of EIC stock through the Kaufman offer or through a higher offer. After the filing of the petition of the majority co-executors for court approval of the Pallas offer, Rhoda Sax filed an amendment to her petition seeking acceptance of the Kaufman offer at $14.30 a share or, alternatively, the holding of a judicial sale of the shares to the highest bidder. Judge Dunne of the probate court, acting on the petitions of both Rhoda Sax and the majority co-executors, followed the recommendation of Rhoda Sax and ordered a court sale to the highest bidder. The attorneys for Rhoda Sax then successfully defended Judge Dunne's determination of the manner in which the sale should take place from the challenges of the majority co-executors. At all times Rhoda Sax sought to have the sale of the shares of EIC stock made in the manner in which the shares were actually sold. Even though the will stated that Rhoda Sax should be entirely powerless to

effectuate the sale of the estate shares, her actions belie the will's statement and her present representations. In fact, in the petition of Rhoda Sax's attorneys for fees filed with the probate court they stated that their efforts on behalf of Rhoda Sax resulted in increased benefits for the estate so that they should be awarded fees commensurate with the time expended in connection with the sale of the estate shares. These circumstances clearly show that Rhoda Sax's participation in the sale of the shares of the EIC stock was sufficient to hold her liable under section 16(b).

In *Whiting v. Dow Chemical Co., supra* at 688–89, the court held that control need not be exclusive for section 16(b) to be applicable as long as a person is in a position to obtain inside information. Rhoda Sax was an insider through her own stock ownership of over 10 percent of EIC stock and her position as an executor of the estate of George Sax holding over 10 percent of EIC stock. While Rhoda Sax did not have exclusive control over the sale made as she shared control with the majority co-executors and control over the mechanics with the court, as an insider she is still liable under section 16(b).

▮ The defenses asserted by the defendants are not applicable to the transaction alleged to be a sale especially here, where the circumstances suggest the possibility of speculative abuse. Accordingly, the sale of the shares of EIC stock to the highest bidder in a private judicial sale on May 7, 1976, is a sale for the purposes of section 16(b).

## CONCLUSION

▮ The court finds that the estate of George Sax, a 10 percent beneficial owner of shares of EIC stock, purchased 14,318 shares of EIC stock at $10.49 a share from the Sax Foundation on December 22, 1975, and sold 190,727 shares of EIC stock at $18.59 a share on May 7, 1976. The purchase and sale occurred within six months of each other. The plaintiff need not further show that the co-executors of the estate of George Sax improperly used inside information or had actual access to inside information, as the application of section 16(b) is automatic upon a finding of a purchase and sale within a six-month period. *Allis-Chalmers, supra* at 351–52. The application of section 16(b) is further warranted as the possibility of speculative abuse was present in relation to both transactions. As no material issue of fact exists and the requirements for liability under section 16(b) of the Securities Exchange Act of 1934 are met, summary judgment will be entered in favor of the plaintiff pursuant to Fed.R.Civ.P. 56. Plaintiff is entitled to recover $115,976 and interest from May 7, 1976, on behalf of defendant Exchange International Corporation from defendant co-trustees of the estate of George Sax—Samuel Wm. Sax, Edward L. Sax, and the Continental Illinois National Bank and Trust Company of Chicago.

For the reasons stated, it is therefore ordered that plaintiff's motion for summary judgment shall be, and the same is hereby, granted, and defendants' motions for summary judgment shall be, and the same are hereby, denied.

It is further ordered that counsel for the plaintiff prepare and submit an appropriate form of judgment.

## SUPPLEMENTAL ORDER

This cause is before the court on the motion of defendants for reconsideration of this court's decision granting summary judgment to plaintiff and denying summary judgment to defendants. For the reasons stated, the motion is granted in part and denied in part.

First, defendants argue that the court's conclusion, that the rescission by the estate of George Sax of George Sax's acts of self-dealing was a section 16(b) purchase, should be reconsidered in light of the decisions in *S. & S. Realty Corp. v. Kleer-Vu Industries, Inc.,* CCH Fed.Sec.L.Rep. ¶ 96,056 (S.D.N.Y. 1977), and *Morales v. Great America Corporation,* 445 F.Supp. 869 (M.D.La.1978). The cases cited raise no new issues. Furthermore, they are distinguishable from the

case at bar because the possibility of speculative abuse was present in the rescission of George Sax's acts of self-dealing, and the cases relied on by the courts in *S. & S. Realty Corp.* and *Morales* were discussed and distinguished in the court's memorandum and order of April 7, 1978.

Second, defendants argue that the amount of the judgment should be reduced by the amount of expenses incurred in carrying out the purchase and sale, including the reasonable attorney's fees which arose in connection with the probate court proceedings. Defendants' argument is totally without merit. Acceptance of their argument would severely frustrate the penal and remedial purposes of section 16(b). *Epstein v. Shindler,* 200 F.Supp. 836, 837 (S.D.N.Y.1961).

Third, defendants argue that the award of interest on the judgment for the plaintiff should be computed from the date of judgment rather than from the date of the last section 16(b) transaction. In a section 16(b) case an award of interest is discretionary. *Blau v. Lehman,* 368 U.S. 403, 414, 82 S.Ct. 451, 7 L.Ed.2d 403 (1962). Because the defendants' violation of section 16(b) could have been inadvertent, the court's memorandum and order of April 7, 1978, is modified to award interest from that date rather than from the date of the sale of EIC stock on May 7, 1976. Of course, as explained in the memorandum and order of April 7, 1978, possible inadvertence is no defense to a finding of section 16(b) liability.

For the reasons stated, it is therefore ordered that the court's memorandum and order of April 7, 1978, be modified to provide for interest to be awarded from the date of judgment rather than from the date of the last section 16(b) transaction, and that in all other respects, defendants' motion for reconsideration shall be, and the same is hereby, denied.