Joan G. LYNAM, Plaintiff,

v.

Julius LIVINGSTON and Livingston Oil Company, Defendants.

Civ. A. No. 3062.

United States District Court
D. Delaware.

Oct. 31, 1967.

Rehearing Denied Nov. 14, 1967.

See also D.C., 257 F.Supp. 520.

William T. Lynam, III, Wilson & Lynam, Wilmington, Del., for plaintiff.

H. Albert Young, H. James Conaway, Jr., and Edward B. Maxwell, 2nd, Young, Conaway, Stargatt & Taylor, Wilmington, Del., for defendant Julius Livingston.

Louis Finger, Richards, Layton & Finger, Wilmington, Del., for defendant Livingston Oil Company.

## OPINION

STEEL, District Judge.

This action is brought by a stockholder of Livingston Oil Company, the nominal defendant, against Julius Livingston, an officer and director of the company, the real defendant. The action is before the Court upon the motion of the individual defendant for summary judgment as to Claim 1. The parties have stipulated that the motion involves only issues of law.

Claim 1 alleges that Livingston purchased and sold within six months common stock of the company and that under Section 16(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78p(b)) the company is entitled to recover the profit which Livingston, as an insider, realized on the purchase and sale.

Jurisdiction exists under Section 27 (15 U.S.C. § 78aa) of the Act.

The undisputed facts are these:

In 1962 Livingston purchased $307,200 principal amount of the company's debentures.[1] The debentures were convertible at the option of the holder immediately upon their issuance and thereafter until redemption, on a basis stipulated in the Indenture. The conversion right was protected against dilution. On November 19, 1964 the board of directors of the company called the debentures for redemption and fixed January 6, 1965 as the redemption date. The debentures holders were advised by letter of their right to convert prior to the redemption date, and that it was expected that all of the debentures would be converted rather

---

[1]. Actually, he purchased a larger amount but only $307,200 are relevant.

than be redeemed for cash. This was because the price of the common stock was then such as to give to the stock which a $1,000 debenture holder would receive upon conversion a value of approximately $1,950 as against the $1,057.50 which he would receive in cash if no conversion took place.

On December 8, 1964 Livingston converted his $307,200 principal amount of debentures into 37,417 shares of common stock, which the Indenture entitled him to do.

On February 22, 1965, Livingston transferred 25,000 shares of oil company common stock in connection with the purchase of certain real estate. The stock was valued by the parties for purposes of the transaction at $13 per share. On February 19, 1965 and February 23, 1965, the dates immediately before and after the transactions, the highest price of the common stock on the New York Stock Exchange was at 13⅝ per share.

Plaintiff has proceeded on the theory that the 25,000 shares which Livingston transferred had been acquired by him on December 8, 1964 when he converted his debentures, and that the conversion constituted a purchase of the stock which he sold on February 22, 1965; hence he must account to the oil company for the profits which he realized.

Livingston seeks a dismissal of Count 1 upon two grounds: (1) the conversion of the debentures into common stock did not constitute a purchase of common stock, and (2) if it did, plaintiff has failed to prove that Livingston realized a profit upon their subsequent sale.

*Was the Conversion a Purchase*

■ If the conversion had taken place before the debentures were called for redemption the exchange of the debentures for the stock would have to be treated as a purchase of the stock. Heli-Coil Corp. v. Webster, 352 F.2d 156 (3rd Cir. 1965). Here, however, the conversion was effected after the debentures had been called for redemption. The distinction is important. In *Heli-Coil,* the debentures not having been called for redemption, a holder was free to convert or redeem his debenture as he chose. In a real sense the conversion was voluntary. Here, however, the conversion which Livingston effected was compelled as a matter of economic necessity.[2] If he failed to convert he would have been compelled to accept $1,057.50 cash for each $1,000 bond which he held. If he had sold his debentures on December 8, 1964, at the highest price obtainable on the New York Stock Exchange, he would have realized $1,938.75 with resultant capital gains tax on the difference between this amount and $1,000 which presumably was the issuance price of the debentures. See Int.Rev.Code of 1954 § 1232. By converting the debentures he avoided the tax and received common stock having a market value of approximately $1,950 without the exchange being taxable. Furthermore, the conversion itself could not possibly be treated as a sale of the debentures subject to Section 16(b) since the debentures had been purchased by Livingston in 1962, more than six months before their conversion.[3]

Both Park & Tilford, Inc. v. Schulte, 160 F.2d 984 (2d Cir.), cert. denied, 332 U.S. 761, 68 S.Ct. 64, 92 L.Ed. 347 (1947) and Ferraiolo v. Newman, 259 F.2d 342 (6th Cir. 1958), cert. denied, 359 U.S. 927, 79 S.Ct. 606, 3 L.Ed.2d 629 (1959), deal with the question whether common stock acquired as a result of a conversion

2. *Heli-Coil* in dealing with a voluntary conversion recognized that a compulsory conversion might significantly affect the result. Heli-Coil v. Webster, supra 167.

3. In *Heli-Coil* the Court held that the conversion of debentures within six months of their purchase was a sale of the debentures within the meaning of Section 16(b). But it also held that no

profit was realized upon the "sale" even though the debentures were selling at $2,100 per $1,000 debenture because of their conversion rights and the fact that the market of the common stock was more than twice the conversion price. (pp. 161–168). The SEC apparently agreed. See concurring and dissenting opinion of Judge McLaughlin, Heli-Coil v. Webster, supra 170.

of preferred stock after it has been called for redemption has been "purchased" within the meaning of Section 16(b). The former held that it must be so treated, whereas the latter held that it should not be. After considering *Schulte* and other cases arising in the Southern District of New York, Judge, now Mr. Justice, Stewart, speaking for the Court in *Newman* said (p. 345):

"The standard that emerges from these decisions can be simply stated: Every transaction which can reasonably be defined as a purchase will be so defined, if the transaction is of a kind which can possibly lend itself to the speculation encompassed by Section 16(b)."

This standard was then applied by the Court as a basis for concluding that no purchase of common stock was involved. In distinguishing *Schulte* the Court said:

"The convertible preferred shares which Newman acquired in 1948 were subject at any future time to call for redemption. Once the market price of the common stock rose above the redemption price of the preferred, the preferred, with its undilutable conversion privilege, became, in the objective judgment of the market place, the economic equivalent of the common. The real effect of Ashland's subsequent call of the preferred for redemption was simply to force the surrender of the preference features of the preferred. All of the preferred shareholders were treated alike; full disclosure was made to them; the conversion worked no material change in the proportional equity ownership of Ashland.

This, then, is a case quite different from Park & Tilford, Inc. v. Schulte, 2 Cir., 1947, 160 F.2d 984, certiorari denied 332 U.S. 761, 68 S.Ct. 64, 92 L.Ed. 347, upon which the appellant heavily relies. In that case the insiders exchanged nonmarketable preferred shares for marketable common stock which was "more valuable." See Blau v. Mission Corporation, 2 Cir., 1954, 212 F.2d 77, at page 81, certio-

rari denied 347 U.S. 1016, 74 S.Ct. 872, 98 L.Ed. 1138. The convertibility of the preferred shares in that case was not protected against dilution. The two classes of shares were not, therefore, in any sense economic equivalents. Moreover, the conversion in that case was voluntary in that the insiders had complete control of the corporation and could, therefore, determine whether the preferred would be called for redemption. See Roberts v. Eaton, 2 Cir., 1954, 212 F.2d 82, at page 83, certiorari denied 348 U.S. 827, 75 S. Ct. 44, 99 L.Ed. 652.

Here, by contrast, Newman's conversion of preferred stock into common was in a very real sense involuntary. He would have lost approximately nine dollars a share if he had allowed his preferred shares to be redeemed. While it is true that he could have sold the preferred shares on the open market instead of converting them, it can hardly be said that a failure to sell is tantamount to a purchase. * * *

Newman's conversion of Ashland preferred to Ashland common had none of the economic indicia of a purchase; it created no opportunity for profit which had not existed since 1948. The transaction was not one that could have lent itself to the practices which Section 16(b) was enacted to prevent."

■ All significant aspects of the instant case bring it within the *Newman* ruling. The conversion, therefore, was not a purchase of common stock under Section 16(b).

*Assuming that the Conversion Effected a Purchase of Common Stock, did Livingston Make a Profit.*

■ The act does not define the word "profit". Livingston argues, however, that profit as used in Section 16(b) is the difference between the highest market price of the common stock on the date of sale and the lowest purchase price on the date of purchase. Livingston asserts that if a purchase results from the conversion of a marketable security (as is true in this case) the cost of the stock

is the lowest market price of the converted debentures on the date when they were converted.

Plaintiff argues that this measure of profit is inapplicable in the circumstances of this case. She argues that the profit is the difference between the market value of the stock on the date of sale and the market value of the stock on the date Livingston purchased the convertible debentures.

This latter method of computing profits is inconsistent with that followed in *Heli-Coil*. There the trial Court found that the insider realized a profit consisting of (1) the difference between the initial purchase price of the debentures and their market price on the conversion date, and (2) an additional profit represented by the difference between the selling price of the stock and the value of the stock on the conversion date.[4] The Court of Appeals modified the judgment of the trial Court by eliminating the first element,[5] and affirmed the judgment represented by the second element. This is the formula for profit computation Livingston urges.

Plaintiff's argument would fix December 8, 1964 as the date of purchase of Livingston's stock whereas the cost date would be fixed at May 1, 1962.

Plaintiff concedes the anomaly of having one date as date of purchase and another for pricing. She likewise acknowledges that this formula for profit computation is inconsistent with the *rationale* and result in *Heli-Coil*. Nevertheless, plaintiff contends that the argument which she now presents was not considered in *Heli-Coil* and is supported not only by the underlying purposes of Section 16(b) but also by Steinberg v. Sharpe, 95 F.Supp. 32 (S.D.N.Y.1950), aff'd per curiam, 190 F.2d 82 (2d Cir. 1951), and Berkey and Gay Furniture Co. v. Wigmore, 5 SEC Jud.Dec. 442 (S.D.N.Y.1947).

*Steinberg* involved the question whether a profit within the meaning of Section 16(b) was realized when stock was purchased by an insider pursuant to stock options exercisable between specified periods accruing *after* the issuance of the options and sold within six months after purchase. The Court held that the profit was the difference between the selling price of the stock and the price of the stock when the options became exercisable.

Applying the principle of *Steinberg* to the instant case, plaintiff argues that since the debentures which Livingston purchased in 1962 were immediately convertible into stock, the stock which he received upon conversion on December 8, 1964 should be valued at the market price of the stock when the debentures were bought.

The *Berkey* opinion was oral. Like *Steinberg,* the case involved the exercise of options (denominated in 2 Loss, Securities Regulation 1080 (2d ed. 1961) as "warrants"). According to Professor Loss, profit was determined to be the difference between the sales price of the stock acquired by the exercise of the warrants, and the price at which the warrants could be exercised on the date of their exercise even though the then market price was higher.

Upon the *Berkey* principle Livingston's profit would be the difference between the price at which he sold the stock and the conversion price specified in the Indenture, adjusted to the time of conversion.

■ The problems, and consideration bearing upon their solution, arising from the exercise of stock options and the later sale of the stock obtained thereby, is significantly different from those arising out of a conversion of securities and a later sale of the stock obtained. Professor Loss recognizes this by dealing with the two subjects separately. 2 Loss, Securities Regulation

---

4. The "value" of the stock on the conversion date was measured by the market price of the debentures on the date of conversion. See District Court opinion 222 F.Supp. 831, 837.

5. See footnote p. 5.

1066–1082 (2d ed. 1961). Without expressing any view concerning the acceptability of the *Steinberg* and *Berkey* reasoning, it is sufficient to say that the problems to which they were addressed, being so drastically different from the present one, makes it inappropriate for this Court to depart from the *Heli-Coil* decision.

If the profits realized by Livingston are computed in accordance with *Heli-Coil*—as they must be—plaintiff concedes that no profit was realized by Livingston. A discussion of the figures bearing upon this subject is therefore unnecessary.

The motion of Livingston for summary judgment dismissing Count 1 of the complaint will be granted.

## MEMORANDUM RE PLAINTIFF'S MOTION FOR REARGUMENT

In holding that the conversion of the Livingston Oil Company debentures into common stock was not a purchase of common stock under Section 16(b), this Court relied heavily upon the decision in Ferraiolo v. Newman, 259 F.2d 342 (6th Cir. 1958), cert. denied, 359 U.S. 927, 79 S.Ct. 606, 3 L.Ed.2d 629 (1959). Plaintiff's motion for reargument attacks this reliance upon *Newman,* and asserts that the *rationale* of the latter is contrary to view expressed in Heli-Coil Corp. v. Webster, 352 F.2d 156 (3rd Cir. 1965). Thus, plaintiff argues that the *Newman* test of whether a transaction falls under Section 16(b) was subjective, whereas in Heli-Coil the Court said that Congress intended the test to be entirely objective. This is true. But despite this stated distinction, the *Heli-Coil* opinion indicates that if the Court had had before it the factual situation which confronted *Newman* and this Court—i. e., a conversion *after* a call for redemption with the debentures and common stock substantially economic equivalents—it might well have concluded, as did *Newman,* that the conversion did not constitute a purchase of common stock. The Court in *Heli-Coil* said (p. 163):

"The sum of the decision in Newman, as we read it, is that there is no "sale" within the meaning of § 16(b) when one type of equity security is converted into another if the securities are substantial economic equivalents and the conversion is "involuntary" in the sense that if there is no conversion the owner will suffer substantial economic loss. Obviously the rule of Ferraiolo v. Newman would be equally applicable to a situation in which debentures convertible into common stock were in fact so converted."

At page 167 it added:

"We have noted that the conversion in Ferraiolo was in effect a compulsory one while that in Park & Tilford in substance was not, and though we think this may be a distinction of some importance, compulsion or lack of it is not a factor in the case at bar. We therefore base our conclusion on the "rule of thumb" as stated. We hold in the case at bar that the conversion of the debentures by Webster was a sale of the debentures and a purchase of the common stock."

It would be a dubious interpretation of *Heli-Coil* to read it as rejecting *Newman* as applied to the facts at bar.

Furthermore, if in the case at bar this Court should hold as did *Heli-Coil,* that the conversion of the debentures constituted a sale of the debentures and a purchase of the common stock, it is clear that plaintiff would have no right to relief.

For, if the conversion of the debentures was a "sale", Livingston would have realized no profit subject to Section 16(b) since Livingston had owned the debentures for substantially more than six months. If the price received for the debentures was the value of the common stock into which they were converted, as logic would dictate, then, to be consistent the common stock would take on a new cost base equal to the value of the debentures at the time of their conversion. Since the common stock was sold within six months at a lesser price than its cost so computed (see pp. 8–13

**110**

of original opinion), no Section 16(b) profit would have been realized when the common stock was sold.

Other points raised in plaintiff's motion for reargument have been considered and are deemed to be without merit.

The motion for reargument will be denied.