**ARROW DISTRIBUTING CORP.,**
**Plaintiff-Appellant,**

v.

**Richard A. BAUMGARTNER, et al.,**
**Defendants-Appellees.**

**No. 85–1085.**

United States Court of Appeals,
Fifth Circuit.

March 5, 1986.

As Amended on Denial of Rehearing
May 7, 1986.

Morris J. Levy, New York City, Ronald E. Holub, Dallas, Tex., for Arrow Distributing Corp.

John A. Gilliam, Alan R. Bromberg, Dallas, Tex., for Baumgartner, Eaton & Padgett.

Burke & Burke, New York City, R. Edwin Pearce, Dallas, Tex., for Hogan Systems.

Before GEE, RUBIN and DAVIS, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

A shareholder sued under § 16(b) of the Securities Exchange Act of 1934,[1] on behalf of a corporation whose stock has been registered in accordance with the Act,[2] to recover profits realized by the corporation's officers on the sale of corporation stock. The officers sold stock before the registration, then, after the registration and within six months of the date of sale, exercised a stock option to purchase a greater number of shares at a price lower than the amount for which they had sold their shares. The option was subject to a restriction giving the corporation the right to repurchase 100 percent of the optioned stock if the officers terminated their employment within one year of the grant of the option or 50 percent of the optioned stock if the officers left their jobs within two years of the grant of the option. The officers contend that § 16(b) does not apply because the stock was not registered under the 1934 Act on the date they sold their shares. They argue alternatively, that, if § 16(b) is applicable, whether they realized recoverable gain should be determined by comparing the price they received with the market value of the stock on the date the restrictions lapsed, for on that date shares purchased pursuant to the option first became marketable. If so computed, § 16(b) should not require them to disgorge any gain because the price on that date was higher than the amount they had earlier received. Persuaded by the second argument, the district court rendered summary judgment in favor of the officers. Rejecting both arguments and others now suggested by the corporate officers, we reverse the summa-

---

1. 15 U.S.C. § 78p(b) (1982).

2. *Id.* at § 78*l*(g).

ry judgment and hold that judgment should, instead, be rendered for the corporation.

## I.

In October 1982, Hogan Systems, Inc., granted some of its officers options to purchase stated amounts of its common stock at the price of $4.20 per share, pursuant to an incentive stock option plan that had been approved by its shareholders. The options were granted in accordance with Internal Revenue Code § 422A and the option price, therefore, was presumably "not less than the fair market value of the stock at the time" it was granted.[3] As the company later represented on a registration statement, this price was "at least equal to the fair market value of the shares on the date of grant." Among those to whom options were given were Hogan System's Executive Vice President and Chief Financial Officer, Richard A. Baumgartner, and its Senior Vice Presidents, Richard N. Eaton and Robert P. Padgett.

The incentive stock option agreements initially provided that, as to 50 percent of the shares affected, the options could be exercised only after October 11, 1983, and, as to the rest, only after October 11, 1984. For reasons that do not appear in the record, Hogan Systems, on November 23, 1982, amended the option agreements to make each of them fully exercisable immediately. In return, each optionee gave Hogan Systems an option to repurchase any shares acquired by him under his stock option at the price originally paid if the optionee ceased to be employed by Hogan Systems. This repurchase option terminated, however, as to 50 percent of the shares on October 11, 1983, and as to the remainder on October 22, 1984. The corporation had no repurchase option if the optionee's employment ended because of his death or permanent disability or the dissolution or liquidation of the company. A legend was written on the face of the share certificates stating that the shares were subject to the repurchase option and the certificates were placed in escrow to ensure that the stock could not be sold free of the restriction.

In December 1982, Hogan Systems made a public offering of 1,500,000 shares of its common stock for $21 per share. The total number of its shareholders increased to 500. Although its securities were registered with the Securities and Exchange Commission under the Securities Act of 1933[4] at the time of the offering, Hogan Systems' registration pursuant to the Securities Exchange Act of 1934 did not become effective until July 11, 1983.

Before the registration, in May, 1983, Baumgartner, Padgett, and Eaton each sold shares of Hogan Systems at dates and in amounts listed in the footnote.[5] Each then exercised his stock option in October 1983, less than six months after his sales, to purchase a greater number of shares than the number sold. Baumgartner, for example, had been granted an option to buy 26,100 shares at $4.20. Without exercising his option, he sold 4,500 shares already owned by him on May 13, 1983, at $42.50 per share, and, on May 27, 5,451 shares at $40.00 per share. In October, 1983, Baumgartner exercised his option

---

3. 26 U.S.C.A. § 422A(b)(4) (West Supp.1985).

4. 15 U.S.C. §§ 77a–77aa (1982).

5. The sales and purchases, all of which occurred in 1983, were as follows:

|  | No. of Shares Sold | Price | Date of Sale | No. of Shares Purchased | Price | Date Of Purchase |
|---|---|---|---|---|---|---|
| Baumgartner | 4500 | $43.50 | May 13 | 13,050 | $4.20 | Oct. 12 |
|  | 5451 | 40.00 | May 27 |  |  |  |
| Padgett | 6000 | $43.50 | May 6 | 23,400 | $4.20 | Oct. 10 |
|  | 7268 | 44.25 | May 26 |  |  |  |
| Eaton | 3000 | $43.50 | May 6 | 20,250 | $4.20 | Oct. 11 |
|  | 3634 | 41.00 | May 11 |  |  |  |

and bought 13,050 shares of stock. Hence, Baumgartner sold in May, 1983, for prices ranging from $40 to $43.50 per share, stock on which only seven months earlier, in November, 1982, his option to purchase at $4.20 per share had become exercisable.

Arrow Distributing is the owner of common shares of stock of Hogan Systems. It sued on behalf of Hogan Systems pursuant to § 16(b)[6] to recover the "short-swing" profits made by each of the three officers. For reasons hereafter discussed, Arrow Distributing seeks to recover only the difference between the sale price and the lowest market value of the shares within six months before or after the date of sale, which was the $21 per share offering price of December 10, 1982. If this figure is used to determine the constructive cost or § 16(b) basis of the stock to the insiders, Arrow Distributing contends that the gain realized by each defendant was:

| | |
|---|---|
| Baumgartner | $193,569 |
| Padgett | 303,981 |
| Eaton | 140,180. |

The corporate officers assert, however, that the economic effect of the transactions should be determined on the basis of the difference between the price at which the stock was sold and its market value on the date the corporation's repurchase option lapsed as to the first 50 percent of the shares. Before this date, the officers contend, the optioned shares were unmarketable because of the restrictions placed on them by the option agreement. The market value on October 11, 1983, was $47 per share. Therefore, if the sale price were compared to the market price on that date, the insiders would have realized no gain.

Both parties rely on the 1950 opinion of Judge Harold Medina, as District Judge of the United States District Court for the Southern District of New York, in *Steinberg v. Sharpe*.[7] Judge Medina there excluded from the gain realized on a sale of optioned stock that part of the gain that represented "long-term increment," that was to be treated as compensation for the officer's continued services to the company. He held that the gain for purposes of § 16(b) should be computed by comparing the sale price with the market value of the stock on the date the option "accrued," rather than either the actual cost of the stock or its market value on the date the option was exercised.

The district court denied the plaintiff's motion for summary judgment and granted the individual corporate officers' motion, based on its understanding of the rationale of *Steinberg* without further explanation.

### II.

Congress adopted § 16(b) of the Act, which Professor Louis Loss characterizes as a "nice example of 'native American radicalism,' "[8] to prevent insiders of publicly-held corporations, who had advance knowledge of facts that, upon public disclosure, would produce either a rise or fall in the market price of the stock, from realizing a personal profit by buying or selling the corporation's shares before the good or bad news was made public.[9] The exploitation by insiders of information not available to the public was considered unfair to the

---

**6.** 15 U.S.C. § 78p(b) (1982) provides in part:
   For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) within any period of less than six months, unless such security was acquired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director,

or officer in entering into such transaction of holding the security purchased or of not repurchasing the security sold for a period exceeding six months.

**7.** 95 F.Supp. 32 (S.D.N.Y.1950), *aff'd on opinion below*, 190 F.2d 82 (2d Cir.1951).

**8.** L. Loss, Fundamentals of Securities Regulation 606 (1983).

**9.** *See* S.Rep. No. 1455, 73d Cong., 2d Sess. 68 (1934); S.Rep. No. 792, 73d Cong., 2d Sess. 9 (1934).

public investors who were not privy to the information. Moreover, the profit potential prompted some insiders to manipulate the market price of their corporation's shares by causing the corporation to inaugurate and follow financial policies calculated to produce sudden fluctuations in that price.

Considering any case-by-case rule impracticable, Congress adopted "a flat rule taking the profits out of a class of transactions in which the possibility of abuse was believed to be intolerably great." [10] The general rule used to compute recoverable profits under § 16(b) is to match the shares bought at the lowest price against an equal number of shares sold at the highest price within six months of such purchase. [11] It was described to Congress by the spokesman for the Roosevelt administration who advocated its adoption as a "crude rule of thumb." [12] The rule is frequently and properly referred to as prophylactic because it is designed to preserve the health of the securities market and prevent the disease of insider trading. [13]

### III.

■ The corporate officers first urge that § 16(b) is not applicable because two crucial events occurred before the security was registered: the sale was made and the option agreement was granted.

When a security is not registered under the 1934 Act at the time stock is purchased but is registered before it is sold, § 16(b) has been held applicable. [14] It is, however, a non sequitur to reason that, if the sale precedes both registration and purchase, the section is inapplicable. The sequence of purchase and sale is in no way restricted by the language of § 16(b).

While they acknowledge that the courts have subjected insiders' short-swing transactions to § 16(b) even though the issuer's shares were not registered at the time of the purchases involved, the officers argue that the absence of any decisions involving pre-registration sales proves that such transactions were not intended to be subject to the purview of § 16(b). As Professor Loss has observed in another connection, the lack of jurisprudence concerning some applications of § 16(b) proves little. Because of the simplicity of its provisions, "the number of reported decisions is probably no criterion of the total amount of short-term profits recaptured or, once the section became well known, simply foregone." [15]

This conclusion is supported by another portion of the same section of the statute pertaining to a "beneficial owner," that is, a shareholder of at least 10 percent of the issuer's stock. [16] That clause provides that

10. *Texas Int'l Airlines v. National Airlines, Inc.,* 714 F.2d 533, 538 (5th Cir.1983), cert. denied, 465 U.S. 1052, 104 S.Ct. 1326, 79 L.Ed.2d 721 (1984) (quoting *Kern County Land Co. v. Occidental Petroleum Corp.,* 411 U.S. 582, 592, 93 S.Ct. 1736, 1743, 36 L.Ed.2d 503, 513 (1973), quoting *Reliance Elec. Co. v. Emerson Elec. Co.,* 404 U.S. 418, 422, 92 S.Ct. 596, 599, 30 L.Ed.2d 575, 579 (1972)).

11. *Smolowe v. Delendo Corp.,* 136 F.2d 231, 239 (2d Cir.), cert. denied, 320 U.S. 751, 64 S.Ct. 56, 88 L.Ed. 446 (1943); *Volk v. Zlotoff,* 318 F.Supp. 864, 865 (S.D.N.Y.1970).

12. 15 Stock Exchange Practices, Hearings before Senate Comm. on Banking & Currency, 73d Cong., 2d Sess. 6557 (1934) (testimony of Thomas G. Corcoran).

13. *See, e.g., Reliance Elec. Co. v. Emerson Elec. Co.,* 404 U.S. 418, 428, 92 S.Ct. 596, 602, 30 L.Ed.2d 575, 583 (1972) (Douglas, J., dissenting).

14. *Heli-Coil Corp. v. Webster,* 222 F.Supp. 831, 836 (D.N.J.1963), modified on other grounds, 352 F.2d 156 (3d Cir.1965); *Perfect Photo, Inc. v. Grabb,* 205 F.Supp. 569, 572 (E.D.Pa.1962); *Perfect Photo, Inc. v. Sentiff,* 205 F.Supp. 574, 575 (E.D.Pa.1962). See also *Gold v. Scurlock,* 324 F.Supp. 1211, 1216 (E.D.Va.1971), aff'd in part and rev'd in part on other grounds sub nom *Gold v. Sloan,* 486 F.2d 340 (4th Cir.1973), cert. denied, 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 112 (1974).

15. Loss, *supra* note 8, at 612.

16. 15 U.S.C. § 78p(b) (1982) applies to beneficial owners, directors, and officers. Its last sentence provides:

This subsection shall not be construed to cover any transaction where such *beneficial owner* was not such both at the time of the purchase and sale, or the sale and purchase, of the security involved, or any transaction or transactions which the Commission by rules

§ 16(b) is applicable only if the 10-percent-shareholder status obtains both at the time of the purchase and the sale involved in the short-swing transaction.[17] The statute contains no similar requirement with respect to a short-swing transaction effected by a director or officer of an issuer. The express requirement that a beneficial owner have that status at both ends of the transaction implies that an officer or director need not.

Accordingly, an insider's short-swing transaction is subject to § 16(b) if the insider has held his corporate position at either the time of his purchase or the time of his sale.[18] Analogously, short-swing transactions effected by a director or officer are subject to § 16(b) even though the issuer's securities were registered under § 12(g) of the Act only at the time of purchase or of sale.[19] As Professor Loss states: "The courts have also imposed liability in the cognate situation in which an equity security of the issuer first becomes registered between the dates of the two transactions."[20]

## IV.

In their text on securities regulation, Professors Jennings and Marsh observe: "Employee stock options have been subjected to a very peculiar rule relating to the amount recoverable."[21] When an employee-insider has been granted stock options by his employer, the courts and the Commission have recognized that any profit the insider might realize from a short-swing transaction involving his exercise of the option includes both long-term gain arising from the employment relationship and short-term profit possibly resulting from insider information. Perceiving the injustice of recapturing a long-term gain as a fictitous short-swing profit, the Commission, during the time that *Steinberg* was under submission, adopted Rule 16b–6,[22] limiting the amount of recoverable gain in employee-stock-option cases to the difference between the sale price and the lowest market price within a period of six months before and after the date of the sale.

█ Both parties agree, therefore, that in computing the amount recoverable from an insider transaction proscribed by § 16(b) —a sale within six months of a stock purchase pursuant to an employee stock option—the constructive cost of the shares purchased is the highest of three alternative amounts: (1) the exercise price of the option; (2) the lowest market price of the issuer's stock within six months before or after the date of the sale (the Rule 16b–6 price); or (3) the market value of the issuer's shares on the accrual date of the option (the *Steinberg* rule). The parties, however, interpret *Steinberg* differently and disagree as to the "accrual date" yielded by the *Steinberg* rule. Arrow Distributing alleges that the accrual date is November 23, 1982, when the options first became exercisable, while the officers argue that the accrual date is October 11, 1983, when the repurchase option lapsed as to the first 50 percent of the shares. Because each date produces a different amount of recoverable gain, Arrow Distributing argues that Rule 16b–6, not the *Steinberg* rule, should be used here because it would make the cost of the stock to the officers the highest and thus minimize the amount of recoverable gain. The officers respond

and regulations may exempt as not comprehended within the purpose of this subsection. (Emphasis added.)

**17.** *See also Foremost-McKesson, Inc. v. Provident Securities Co.,* 423 U.S. 232, 96 S.Ct. 508, 46 L.Ed.2d 464 (1976); *Reliance Elec. Co. v. Emerson Elec. Co.,* 404 U.S. 418, 92 S.Ct. 596, 30 L.Ed.2d 575 (1972).

**18.** *Feder v. Martin Marietta Corp.,* 406 F.2d 260, 262 (2d Cir.1969), *cert. denied,* 396 U.S. 1036, 90 S.Ct. 678, 24 L.Ed.2d 681 (1970).

**19.** *See* cases cited *supra* note 14.

**20.** Loss, *supra* note 8, at 637.

**21.** R. Jennings and H. Marsh, Jr., Securities Regulation 1353 (5th ed. 1982).

**22.** 17 C.F.R. § 240.16b–6 (1985).

that the *Steinberg* rule produces the highest constructive cost of their shares.

To persuade us to fix the date it has chosen, each party urges us to read from the opinion the phrases selectively chosen by them as if each phrase were holy writ, or at least the text of a statute. Because the principle adopted in *Steinberg* has been widely accepted,[23] and the parties agree that it is applicable, we follow that principle, but we interpret the decision in accordance with its common sense rationale, not as an exercise in hermeneutics.

The corporate-officer defendant in *Steinberg* had been given stock options in 1944 and 1945, based on the market price of the stock at the time each option was granted. In 1948, the officer exercised both options. By this time the market value of the stock had increased about 250 percent. The officer sold a number of shares of corporate stock within two weeks before and one week after exercising the option.

The court refused to use the actual cost of the stock in computing the short-swing profit because this would deprive the officer of "so much of the value of the option as represented long-term increment, to which the defendant was entitled pursuant to the option agreements by virtue of his continued services to the corporation."[24] It also declined to use the market value of the stock on the date of its purchase because, if that date were controlling, the officer might avoid the application of § 16(b) "merely by deferring the exercise of options because he anticipated an increase in the value of the stock on the basis of some inside information."[25] In order to give the officer the benefit of the long-term increment in value that represented compensation for services, yet not vitiate § 16(b), the court held that the "cost" of the security for § 16(b) purposes would be the price actually paid "plus the value of the option *on the date that it accrued as fixed by the employment agreement* under the terms of which it accrued."[26]

Judge Medina did not use the word "accrued" as a term of art, but to refer to the day the option became exercisable. This formula has come to be known as the "*Steinberg* rule." It has been cited with approval in numerous cases,[27] and implicitly approved by the Commission, which has adopted and maintained Rule 16b–6 to cover situations to which the *Steinberg* rule would apply too harsh a penalty.

■ The date the Hogan Systems options became exercisable was November 23, 1982, when the option agreements were amended. The insiders contend that their stock should not be valued as of that date because it was then subject to the corporation's repurchase option and this in effect prevented its resale. They contend that the date when the options "accrued," using Judge Medina's word, was ʻthe date the stock was freed of restrictions, October 11, 1983, and thereby became marketable—an interpretation that would result in no recoverable gain because the stock on that date had a market value in excess of the price for which it had been sold.

The literal language of § 16(b) would measure recoverable gain by the difference between actual cost and sale price. The *Steinberg* rule is an amelioration of the harsh effect that would result by blanket application of this interpretation. The fact that some restriction was imposed on the

---

**23.** *See, e.g., B.T. Babbitt, Inc. v. Lachner,* 332 F.2d 255 (2d Cir.1964); *Kornfeld v. Eaton,* 327 F.2d 263 (2d Cir.1964); *Spirt v. Bechtel,* 232 F.2d 241 (2d Cir.1956); *Colema Realty Corp. v. Bibow,* 555 F.Supp. 1030 (D.Conn.1983); *Lewis v. Realty Equities Corp.,* 396 F.Supp. 1026 (S.D.N.Y.1975); *Levy v. Seaton,* 358 F.Supp. 1 (S.D.N.Y.1973); *Volk v. Zlotoff,* 318 F.Supp. 864 (S.D.N.Y.1970); *Lynam v. Livingston,* 276 F.Supp. 104 (D.Del.1967). *See also Blau v. Max Factor & Co.,* 342 F.2d 304 (9th Cir.), *cert. denied,* 382 U.S. 892, 86 S.Ct. 180, 15 L.Ed.2d 150 (1965).

**24.** *Steinberg v. Sharpe,* 95 F.Supp. 32, 34 (S.D.N.Y.1950), *aff'd,* 190 F.2d 82 (2d Cir.1951).

**25.** 95 F.Supp. at 33.

**26.** 95 F.Supp. at 34 (emphasis added and in original).

**27.** *See* cases cited *supra* note 23.

stock when the option is exercised does not justify further extending that clement application to give the insider the benefit of an even longer time within which to look for enhancement in value. Restrictions are of varied design: they may require the shareholder first to offer the stock to the corporation at a fixed price before reselling it, or to accord the corporation a first refusal right to match third-party offers, or to give the corporation an option to buy the stock on the occurrence of various events at a price determined in various ways; they may prohibit transfer without consent of the issuing company, prohibit transfer to certain classes of persons, prohibit any transfer whatever, or, as here, give the corporation a first refusal right to repurchase the stock at the insider's cost. The analysis advocated by the officers would force the court to consider and evaluate the individual nature of each restriction on a case-specific basis.

This would dull the sharp rule of § 16(b). In *Freeman v. Decio*,[28] the Seventh Circuit held that restrictions on the resale of stock do not prevent its acquisition from being a § 16(b) purchase, saying: "[I]t is well settled that an insider acquires stock for the purposes of 16(b) when he has 'incurred an irrevocable liability to take and pay for the stock' and his 'rights and obligations become fixed.' "[29] The insiders seek to distinguish *Freeman* on the basis that the opinion does not indicate what the restrictions were and argue that some restrictions have little or no effect on the ability to dispose of the stock profitably. The argument defeats the point sought to be made, for it would require that every restriction be assessed. With § 16(b) Congress sought to establish a bright-line rule. The analysis proposed by the insiders would

require a case-by-case interpretation whenever stock is acquired through the exercise of an employee's stock option. And, as the First Circuit remarked in *Riseman v. Orion Research, Inc.*:[30] "Numerous opportunities for speculation would arise if 'conditions precedent' that are within the control of the seller or purchaser could be written into option contracts to postpone the date of 'purchase' for purposes of § 16(b)."

We refuse the officers' invitation and adhere to the equitable solution reached by Judge Medina in *Steinberg*. The accrual date for the purpose of measuring § 16(a) liability is the date the option first became exercisable—in this case, November 23, 1982.

## V.

■ The insiders contend, in a last-ditch defense, that § 16(b) should not be applied to them because in this case there was no possibility of speculative abuse. The existence of that possibility is irrelevant, for neither actual use of inside information nor intention to exploit such information is required to establish § 16(b) liability. In the "garden variety" insider purchase and sale, or sale and purchase, of securities within a period of less than six months, proof of the possibility of speculative abuse is wholly immaterial.[31]

The officers contend that the contemporary view is to read § 16(b) liberally. They point out that § 16(b) was interpreted in the 1940s and 1950s to "squeeze all possible profits out of stock transactions"[32] by corporate insiders. But they say that in the § 16(b) cases the Supreme Court has decided in the last fifteen years, it has each time found § 16(b) inapplicable and has rejected a literal interpretation of the statute in favor of a pragmatic approach that re-

**28.** 584 F.2d 186 (7th Cir.1978).

**29.** *Id.* at 200 (citing *Blau v. Ogsbury,* 210 F.2d 426, 427 (2d Cir.1954), and *Silverman v. Landa,* 306 F.2d 422, 424 (2d Cir.1962)).

**30.** 749 F.2d 915, 921 (1st Cir.1984).

**31.** *Kern County Land Co. v. Occidental Petroleum Corp.,* 411 U.S. 582, 93 S.Ct. 1736, 36 L.Ed.2d 503 (1973); *Feder v. Martin Marietta*

*Corp.,* 406 F.2d 260, 262 (2d Cir.1969), *cert. denied,* 396 U.S. 1036, 90 S.Ct. 678, 24 L.Ed.2d 681 (1970).

**32.** The phrase as taken from *Smolowe v. Delendo Corp.,* 136 F.2d 231, 239 (2d Cir.), *cert. denied,* 320 U.S. 751, 64 S.Ct. 56, 88 L.Ed. 446 (1943).

flects the economic realities of the transaction.[33] Additionally, they note that commentators have criticized the arbitrary and often unfair operation of § 16(b).[34]

The officers misconstrue the jurisprudence. The courts developed this "pragmatic approach" to cover cases involving the application of § 16(b) to transactions that were not classic purchases and sales for cash, but were more accurately characterized as "unorthodox transactions." Using this analysis, courts found § 16(b) liability whenever the challenged transactions were likely to involve the potential for speculative abuse that the statute was designed to prevent. A common thread in the § 16(b) cases in which no liability was assessed, however, was the involuntary participation of those alleged to have engaged in short-swing trading.[35] Such a factor was not present in this case. The officers had complete control over the timing of the exercise of their respective stock options.

Moreover, such a hortatory argument, as Judge Curtis Bok wrote, leads to no clear conclusion: "They might as well have said, if you meet a monster in a dark street, construe it liberally and everything will be all right." [36] The argument suggests that we read into court decisions dealing with other, albeit related, issues, intimations of liberality that simply are not there. The defendants invite judicial repeal of a rule because it is arbitrary, although it is no more so than thousands of other statutory bright lines. Our response is that their invitation is misaddressed. Congress has not altered the language of § 16(b) for over half a century, and it is not the judiciary's task to revise the rule into what might be in some eyes a more equitable rule.

The insiders' companion economic-reality argument points to no specific direction. "[T]he economists are not of one persuasion." [37] The strictly economic arguments, moreover, display "apparent scorn for the moral or public opinion factor." [38] "Why should the public enter the market," Professor Loss writes, "if the rules of the game make it perfectly legitimate for insiders (and their friends and business associates) to play with marked cards?" [39] Section 16(b) is a strict-liability rule. It was enacted precisely because of the difficulty of establishing whether an insider did indeed benefit from the information available to him in his strategic position. It adopts a purely objective test: if a sale and a purchase or a purchase and a sale result in net gain, the gain is recoverable.

The argument that the officers might have avoided any possibility of liability to the corporation by postponing the exercise of their option ignores the fact that § 16(b) may always be escaped by waiting at least six months between the two transactions. As Professor Loss has pointed out, the " 'crude rule of thumb' works two ways. An insider who holds for six months or more before selling does not become liable under § 16(b), no matter how much proof is adduced of unfair resort to nonpublic information." [40] That the insider ignorantly or illadvisedly made a sale or a purchase with-

---

**33.** *Foremost-McKesson, Inc. v. Provident Securities Co.,* 423 U.S. 232, 96 S.Ct. 508, 46 L.Ed.2d 464 (1976); *Kern County Land Co. v. Occidental Petroleum Corp.,* 411 U.S. 582, 93 S.Ct. 1736, 36 L.Ed.2d 503 (1973), *citing Reliance Elec. Co. v. Emerson Elec. Co.,* 404 U.S. 418, 92 S.Ct. 596, 30 L.Ed.2d 575 (1972).

**34.** *See, e.g.,* R. Jennings & H. Marsh, Jr., Securities Regulation 1315–16 (5th ed. 1982).

**35.** *See Kent County Land Co. v. Occidental Petroleum Corp.,* 411 U.S. 582, 600, 93 S.Ct. 1736, 1747, 36 L.Ed.2d 503, 517 (1973) (an unsuccessful tender offeror, left with a large block of shares in the target company following that company's consummation of a defensive merg-

er, had no choice but to exchange its shares in the target for stock in the newly constituted corporation). *See also* "Involuntariness and Other Contemporary Problems under § 16[b] of the Securities Exchange Act of 1934," 27 Hastings L.J. 679 (1976).

**36.** C. Bok, Backbone of the Herring 145.

**37.** Loss, *supra* note 8, at 607 and note 9.

**38.** *Id.* at 608.

**39.** *Id.*

**40.** *Id.* at 611.

in the period, when he might have avoided the statute by waiting, does not obviate its application.

For these reasons, the judgment in favor of the defendant-officers is REVERSED and judgment is rendered on behalf of the plaintiff-stockholder. The case is RE-MANDED for computation of the recoverable gain consistent with this opinion.

We express no opinion concerning what was the lowest market value of the shares, an issue that was neither fully briefed nor fully developed on the record.